**ORAL ARGUMENT NOT YET SCHEDULED**

Nos. 22-1151, 22-1152, 22-1202, 22-1203

IN THE
United States Court of Appeals
for the District of Columbia Circuit

RANGE RESOURCES – APPALACHIA, LLC and COLUMBIA GULF
TRANSMISSION, LLC,

Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent,

TEXAS EASTERN TRANSMISSION, LP,

Intervenor-Respondent.

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

**INITIAL BRIEF FOR PETITIONERS
RANGE RESOURCES – APPALACHIA, LLC AND
COLUMBIA GULF TRANSMISSION, LLC**

SEAN MAROTTA
MATTHEW J. HIGGINS
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
matthew.higgins@hoganlovells.com
(202) 637-5889

DAVE HAMMEL
TC ENERGY CORPORATION
700 Louisiana Street, Suite 700
Houston, TX 77002

*Counsel for Columbia Gulf Transmission, LLC*

December 29, 2022

JOHN PAUL FLOOM
KACI W. POOR
FLOOM ENERGY LAW PLLC
3100 Clarendon Blvd., Suite 920
Arlington, VA 22201
jpf@floomenergylaw.com
(571) 842-8185
kwp@floomenergylaw.com
(571) 842-8189

*Counsel for Range Resources – Appalachia, LLC*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     PARTIES

Petitioners are Range Resources – Appalachia, LLC ("Range") and Columbia Gulf Transmission, LLC ("Columbia Gulf").

Respondent is the Federal Energy Regulatory Commission ("FERC").

There are no Intervenors for Petitioner in this proceeding.

Intervenor for Respondent is Texas Eastern Transmission, LP ("Texas Eastern").

On the Court's own motion, EQT Energy, LLC has been permitted to participate as amicus curaie.

### B.     CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, Range hereby submits this corporate disclosure statement.  Range is a limited liability company organized and operating under the laws of the State of Delaware.  Range is a natural gas producer with operations focused on the development of the Marcellus shale formation in Pennsylvania.

Range is a direct, wholly owned subsidiary of Range Resources – Pine Mountain, Inc., which is a wholly owned subsidiary of Range Resources Corporation.  Range Resources Corporation is a publicly held company registered

on the New York Stock Exchange (Trading Symbol "RRC") and is the only entity that has a 10% or greater ownership interest in Range.

Columbia Gulf Transmission, LLC is a 3,340-mile pipeline serving Louisiana, Mississippi, Tennessee, and Kentucky. Columbia Gulf connects to virtually every major pipeline in the U.S. Gulf Coast and to additional Midwestern lines.

Columbia Gulf Transmission, LLC is a wholly owned subsidiary of Columbia Pipeline Group, Inc., which is a wholly owned subsidiary of TransCanada PipeLine USA Ltd., which is a wholly owned subsidiary of TransCanada PipeLines Limited, which is a wholly owned subsidiary of TC Energy Corporation. TC Energy Corporation is incorporated in Alberta, Canada. It publicly trades on the New York Stock Exchange, and no person or entity has a 10% or greater ownership interest.

### C.    RULINGS UNDER REVIEW

The following FERC orders are the subject of the review in this proceeding:

- *Range Resources – Appalachia, LLC v. Texas Eastern Transmission, LP*, Docket Nos. RP22-433-000 and RP22-435-000 (Not Consolidated), Order Dismissing Complaints, 178 FERC ¶ 61,217 (Mar. 24, 2022);

- *Range Resources – Appalachia, LLC v. Texas Eastern Transmission, LP*, Docket Nos. RP22-433-001 and RP22-435-001 (Not Consolidated), Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 179 FERC ¶ 62,106 (May 26, 2022); and

- *Range Resources – Appalachia, LLC v. Texas Eastern Transmission, LP*, Docket Nos. RP22-433-001 and RP22-435-001 (Not Consolidated), Order Addressing Arguments Raised on Rehearing, 180 FERC ¶ 61,079 (Aug. 5, 2022).

### D.   RELATED CASES

This case has not previously been before this Court or any other court.  There are no other related cases that involve substantially the same parties and present the same or similar issues.

<table>
<tr><td>

Sean Marotta
Matthew J. Higgins
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
matthew.higgins@hoganlovells.com
(202) 637-5889

Dave Hammel
TC ENERGY CORPORATION
700 Louisiana Street, Suite 700
Houston, TX 77002

*Counsel for Columbia Gulf Transmission, LLC*

</td><td>

*/s/ John Paul Floom*
John Paul Floom
Kaci W. Poor
FLOOM ENERGY LAW PLLC
3100 Clarendon Blvd., Suite 920
Arlington, VA 22201
jpf@floomenergylaw.com
(571) 842-8185
kwp@floomenergylaw.com
(571) 842-8189

*Counsel for Range Resources – Appalachia, LLC*

</td></tr>
</table>

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ....... i

TABLE OF CONTENTS ................................................................ iv

TABLE OF AUTHORITIES ........................................................ vii

GLOSSARY .................................................................................. x

JURISDICTIONAL STATEMENT ................................................ 1

INTRODUCTION ........................................................................ 2

ISSUES PRESENTED ................................................................... 4

STATEMENT OF THE CASE ...................................................... 4

   I.    Technical Background. ...................................................... 4

   II.   Factual Background ......................................................... 5

      A.    The Adair Interconnect ............................................ 5

      B.    Texas Eastern's tariff and applicable contracts. ........................... 7

      C.    Texas Eastern's operational problems begin ................................ 9

         1.  *Gulf XPress Project* ...................................................... 9

         2.  *The Pipeline and Hazardous Materials Safety Administration takes remedial action, forcing Texas Eastern to reduce its operating pressure*. .11

      D.    Twice, Texas Eastern's failure to send gas at adequate pressures caused Columbia Gulf to curtail service ............................................ 12

         1.  *The 2019 Curtailment* .................................................. 12

         2.  *The 2021 Curtailment: Receipts go to zero, as Texas Eastern claims force majeure* ............................................................ 14

      E.    Texas Eastern asserts that it has no minimum pressure obligation .......... 17

   III.   Procedural History ....................................................... 18

      A.    Range and Columbia Gulf file complaints with FERC against Texas Eastern ............................................................... 18

      B.    FERC denies the complaints on legal grounds and without holding an evidentiary hearing ................................................. 20

      C.    FERC denies Range's and Columbia Gulf's requests for rehearing ........ 22

## TABLE OF CONTENTS—Continued

Page

**STATUTES AND REGULATIONS** ..............................................**25**

**STANDARD OF REVIEW** ........................................................**25**

**SUMMARY OF ARGUMENT** ...................................................**25**

**STANDING** ................................................................................**28**

**ARGUMENT** ..............................................................................**31**

I.  FERC'S RULINGS THAT TEXAS EASTERN DID NOT VIOLATE
    SECTION 6.2 OF ITS TARIFF AND SECTION 4.02(E) OF THE ADAIR
    INTERCONNECTION AGREEMENT ARE ARBITRARY AND
    CAPRICOUS. ........................................................................31

    A.  Section 6.2 of Texas Eastern's tariff imposes a minimum pressure
        obligation, and FERC's contrary interpretation warrants remand. ...........32

        1.  *FERC's interpretation that Section 6.2 does not impose a minimum
            pressure obligation is plainly wrong* ...........................................32

        2.  *Remand is warranted because Range adequately pled its Section 6.2
            claim* ...................................................................................33

    B.  FERC's Interpretation That Section 4.02(E) Of The Adair Interconnection
        Agreement Does Not Include A Minimum Pressure Obligation Is Plainly
        Incorrect And Warrants Remand. ...............................................38

        1.  *Section 4.02(E) imposes a minimum pressure obligation, and FERC's
            contrary interpretation is plainly wrong.* ...................................38

        2.  *Remand is warranted, despite FERC's alternative Rule 206 ruling* ..........40

II. FERC SEPARATELY FAILS TO JUSTIFY ITS DEPARTURES FROM
    *NORTHERN NATURAL.* ........................................................44

    A.  FERC unreasonably departed from *Northern Natural*'s default rule that
        delivering pipelines must deliver gas at sufficient pressure.....................44

    B.  FERC unreasonably departed from *Northern Natural*'s tariff
        interpretation.......................................................................48

III. FERC'S DECISION TO DENY A HEARING ON CONTESTED FACTUAL
     ISSUES WAS ARBITRARY AND CAPRICIOUS. ....................................51

## TABLE OF CONTENTS—Continued

Page

A.    FERC was required to hold an evidentiary hearing to determine whether Range was similarly situated to other shippers on the Texas Eastern system. ...................................................................................................51

B.    FERC was required to hold an evidentiary hearing to determine whether a *force majeure* event occurred. .................................................................54

**CONCLUSION.............................................................................................58**

CERTIFICATE OF COMPLIANCE.....................................................59

CERTIFICATE OF SERVICE ...........................................................60

STATUTORY AND REGULATORY ADDENDUM ...........................................

EDGAR TRILLO STANDING AFFIDAVIT ...........................................

# TABLE OF AUTHORITIES

Page

## **Cases**

*Ameren Servs. Co. v. FERC*, 330 F.3d 494 (D.C. Cir. 2003) ..................................31

*Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012) .........................................................................................................30

*Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C Cir. 2017) .................................. 28, 31

*Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173 (D.C. Cir. 2022).......................46

*Cajun Elec. Power Coop., Inc. v. FERC*, 28 F.3d 173 (D.C. Cir. 1994)................55

*Cajun Elec. Power Coop., Inc. v. FERC*, 924 F.2d 1132 (D.C. Cir. 1991)............38

*Cal. Pub. Utilities Comm'n v. FERC*, 20 F.4th 795 (D.C. Cir. 2021)....................40

*Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964 (D.C. Cir. 2003)............34

*Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127 (D.C. Cir. 2014) ................................................................................................43

*FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441 (D.C. Cir. 2005)...... 32, 39

*Gen. Motors Corp. v. FERC*, 656 F.2d 791 (D.C. Cir. 1981).................................51

*Global Van Lines, Inc. v. ICC*, 804 F.2d 1293 (D.C. Cir. 1986)............................41

*Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4 (D.C. Cir. 2015)........................28

* *Idaho Power Co. v. FERC*, 312 F.3d 454 (D.C Cir. 2002)............................ 32, 49

*Illinois Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555 (D.C. Cir. 1997) ...............50

*In re Permian Basin Rate Cases*, 390 U.S. 747 (1968) .............................................5

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42 (D.C. Cir. 2019) ................................................................................................................29

* *Kentucky Municipal Energy Agency v. FERC*, 45 F.4th 162 (D.C. Cir. 2022)....47

*Long Island Power Auth. v. FERC*, 27 F.4th 705 (D.C. Cir. 2022)........................41

*Louisiana Pub. Serv. Comm'n v. FERC*, 20 F.4th 1 (D.C. Cir. 2021) ...................33

*Louisiana Pub. Serv. Comm'n v. FERC*, 772 F.3d 1297 (D.C. Cir. 2014) ............46

*Missouri Pub. Serv. Comm'n v. FERC*, 215 F.3d 1 (D.C. Cir. 2000) ....................25

* Authorities upon which we chiefly rely are marked with an asterisk.

## TABLE OF AUTHORITIES—Continued

Page

*Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1 (D.C. Cir. 2005)....... 28, 31

\* *New England Power Generators Ass'n v. FERC,* 881 F.3d 202 (D.C. Cir. 2018) ................................................................................................................ 46, 47

*NextEra Desert Ctr. Blythe, LLC v. FERC*, 852 F.3d 1118 (D.C. Cir. 2017) ........31

*PPG Indus., Inc. v. United States*, 52 F.3d 363 (D.C. Cir. 1995)............................41

*Pub. Svc. Co. of N.H. v. FERC*, 600 F.2d 944 (D.C. Cir. 1979)............................51

*S. Cal. Edison Co. v. FERC*, 415 F.3d 17 (D.C. Cir. 2005) ..................................40

*S. Cal. Edison Co. v. FERC*, 717 F.3d 177 (D.C. Cir. 2013) ................................54

*Sierra Club v. Jewell*, 764 F.3d 1 (D.C. Cir. 2014) ................................................29

*Sithe/Indep. Power Part., L.P. v. FERC*, 165 F.3d 944 (D.C. Cir. 1999) ..............50

*Skelly Oil Co. v. FPC*, 375 F.2d 6 (10th Cir. 1967)..................................................4

*Southwest Airlines Co. v. FERC*, 926 F.3d 851 (D.C. Cir. 2019) ............. 44, 46, 47

*Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538 (D.C Cir. 2010)..............52

*Utah v. Evans*, 536 U.S. 452 (2002) ......................................................................28

*W & M Props. of Conn., Inc. v. NLRB*, 514 F. 3d 1341 (D.C. Cir. 2008)..............54

**FERC Orders**

*Cities of Anaheim, Azusa, Banning, Colton, Pasadena, and Riverside, Cal. v. Trans Bay Cable LLC*, 146 FERC ¶ 61,100 (2014).......................................................36

*Citizens Energy Task Force & Save Our Unique Lands v. Midwest Reliability Org.*, 144 FERC ¶ 61,006 (2014)..................................................................................35

\* *Columbia Gas Transmission, LLC*, 165 FERC ¶ 61,042 (2018).........................52

*Complaint Procedures*, 84 FERC ¶ 61,082 (1998)................................................41

*Coordination of the Scheduling Processes of Interstate Natural Gas Pipelines and Pub. Utilities*, 151 FERC ¶ 61,049 (2015);............................................................8

\* *El Paso Natural Gas Co*., 99 FERC ¶ 61, 244 (2002),.................................. 24, 53

*Interstate Power & Light Co. v. ITC Midwest, LLC*, 135 FERC ¶ 61,162 (2011)..42

* Authorities upon which we chiefly rely are marked with an asterisk.

## TABLE OF AUTHORITIES—Continued

Page

*Kern River Gas Transmission Co.*, 139 FERC ¶ 61,044 (2012) ...............................8

*Louisiana Pub. Serv. Comm'n v. Entergy Corp.*, 129 FERC ¶ 61,205 (2009)........36

*Luna Valley Solar I, LLC v. Pacific Gas & Elec. Co.*, 177 FERC ¶ 61,099 (2021)36

*Midcontinent Indep. Sys. Operator, Inc.*, 146 FERC ¶ 61,212 (2014)....................33

*National Fuel Gas Supply Corp.*, 93 FERC ¶ 62,045 (2000).....................................6

*NextEra Energy Res., LLC PSEG Cos. v. ISO New England Inc.*, 157 FERC ¶ 61,059 (2016).........................................................................................................42

\* *Northern Natural Gas Co. v. ANR Pipeline Co.*, 109 FERC ¶ 61,201 (2004) .....3, 19, 23, 44, 45, 46, 48, 49, 50

*People of State of Cal. ex rel. Edmund G. Brown Jr., Atty. Gen. v. Powerex Corp.*, 139 FERC ¶ 61,210 (2012)...................................................................................41

*Re Area Rate Proceeding for Permian Basin*, 34 F.P.C. 159 (1965), .................4, 39

*Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, "Order No. 436," 50 FR 42408 (1985)...................................................................................51

*Southwest Power Pool Inc. v. Midwest Indep. Sys. Operator, Inc.*, 146 FERC ¶ 61,231 (2014).......................................................................................................36

*Sunflower Electric Power Corp. v. Kansas Municipal Energy Agency & Municipal Power Pool, Inc.*, 148 FERC ¶ 61,022 (2014) ...................................................42

*Texas Eastern Gas Transmission, LP*, 179 FERC ¶ 61,201 (2022) .........................5

**Statutes**

15 U.S.C. § 717c .......................................................................................................51

15 U.S.C. § 717r(b)......................................................................................................1

**Regulations**

18 C.F.R. § 284.7(a)(3) (2022) ............................................................................5, 51

18 C.F.R. § 284.7(b)(1) (2022)................................................................................51

18 C.F.R. § 385.206(b) ............................................................................................33

\* Authorities upon which we chiefly rely are marked with an asterisk.

# GLOSSARY

| | |
|---|---|
| Columbia Gulf | Columbia Gulf Transmission, LLC |
| FERC or the Commission | Federal Energy Regulatory Commission |
| Joint Complaint | Complaint, *Range Resources – Appalachia, LLC & Columbia Gulf Transmission, LLC v. Texas Eastern Transmission, LP*, FERC Docket No. RP22-433-000 (Dec. 21 2021) |
| MAOP | Maximum Allowable Operating Pressure |
| Order | *Range Resources – Appalachia, LLC v. Texas Eastern Transmission, LP*, 178 FERC ¶ 61,217 (Mar. 24, 2022) |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| psig | pounds per square inch gauge |
| Range Complaint | Complaint, *Range Resources – Appalachia, LLC v. Texas Eastern Transmission, LP*, FERC Docket No. RP22-435-000 (Dec. 21 2021) |
| Rehearing Order | *Range Resources – Appalachia, LLC v. Texas Eastern Transmission, LP*, 180 FERC ¶ 61,079 (Aug. 5, 2022) |
| Range | Range Resources – Appalachia, LLC |
| Texas Eastern | Texas Eastern Transmission, L.P. |

IN THE
United States Court of Appeals
for the District of Columbia Circuit

RANGE RESOURCES – APPALACHIA, LLC, and COLUMBIA GULF
TRANSMISSION, LLC,

Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent,

TEXAS EASTERN TRANSMISSION, LP,

Intervenor-Respondent.

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

**INITIAL BRIEF FOR PETITIONERS
RANGE RESOURCES – APPALACHIA, LLC AND
COLUMBIA GULF TRANSMISSION, LCC**

**JURISDICTIONAL STATEMENT**

The Federal Energy Regulatory Commission denied timely rehearing petitions from Range Resources – Appalachia, LLC and Columbia Gulf Transmission, LLC on August 5, 2022. JA__ (Rehearing Order P 1). Range and Columbia Gulf timely petitioned for review on August 12, 2022. Range and Columbia Gulf each has Article III standing, *see infra* pp. 28-31, and this Court has jurisdiction under 15 U.S.C. § 717r(b).

**INTRODUCTION**

Range is a natural gas producer that holds a long-term contract with Texas Eastern, a natural gas pipeline, to deliver gas to Columbia Gulf, another natural gas pipeline. But for two periods, first in 2019 and then in 2021, Range's gas was never delivered. And it cost Range over $5 million.

Natural gas can only flow from a pipeline system with the higher prevailing line pressure to a system with a lower pressure. Range's gas was not delivered because the prevailing pressure for the delivering pipeline, Texas Eastern, *did not* meet the prevailing pressure for the receiving pipeline, Columbia Gulf. Range and Columbia Gulf filed administrative complaints with FERC, alleging that Texas Eastern had minimum pressure obligations and that its failure to meet those obligations blocked the delivery of Range's gas. But FERC dismissed those complaints—without allowing Range and Columbia Gulf to engage in discovery and without giving them the benefit of an evidentiary hearing.

FERC's ruling was unreasonable several times over. *First*, Section 6.2 of Texas Eastern's tariff and Section 4.02(E) of the Adair Interconnection Agreement between Texas Eastern and Columbia Gulf plainly impose minimum pressure obligations onto Texas Eastern. In the proceedings below, Range and Columbia Gulf explained how Texas Eastern violated those obligations, and they are entitled to discovery and a hearing to prove those claims.

2

*Second*, FERC failed to adequately explain why, even in the absence of contractual obligations, its prior precedent in *Northern Natural Gas Co. v. ANR Pipeline Co.*, 109 FERC ¶ 61,201 (2004), does not require Texas Eastern to maintain a prevailing pressure that meets or exceeds Columbia Gulf's.

*Third*, FERC's decision to deny an evidentiary hearing disregarded key and contested factual questions and was therefore unreasonable. FERC failed to convene a hearing to determine whether Range was treated in an unduly discriminatory manner compared to other firm shippers with service to geographically proximate delivery points—an inquiry FERC has previously described as intensely factually specific. In addition, FERC failed to hold an evidentiary hearing to examine whether Texas Eastern had properly claimed *force majeure*, another disputed and central factual issue, directly affecting the level of reservation charge credits for which Range was eligible.

Any one of these errors warrants vacatur and remand. This Court should vacate FERC's order dismissing Range and Columbia Gulf's complaints and remand so that Range and Columbia Gulf can prove their claims.

## ISSUES PRESENTED

1.      Whether FERC's pre-discovery dismissal of Range's claim that Texas Eastern violated Section 6.2 of its tariff by failing to maintain a pressure of 750 pounds per square inch gauge ("psig") was arbitrary and capricious.

2.      Whether FERC's conclusion that Section 4.02(E) of the Adair Interconnection Agreement does not impose a minimum pressure obligation was arbitrary and capricious, and if so, whether that legal error warrants remand.

3.      Whether FERC adequately explained why its precedent in *Northern Natural* does not require Texas Eastern to send its gas at pressures sufficient to be received on Columbia Gas's pipeline.

4.      Whether FERC acted arbitrarily and capriciously when it did not conduct a hearing to resolve the contested factual issues of whether Range was similarly situated to other firm shippers operating on Texas Eastern's system, and separately, whether Texas Eastern was entitled to declare a *force majeure* event during the 2021 Curtailment.

## STATEMENT OF THE CASE

### I.    Technical Background.

It is well-recognized that natural gas "cannot enter a pipeline unless it is under greater pressure than the pipeline pressure at the point of entry." *Re Area Rate Proceeding for Permian Basin*, 34 F.P.C. 159, 224 (1965), *remanded on other grounds*, *Skelly Oil Co. v. FPC*, 375 F.2d 6 (10th Cir. 1967); *In re Permian Basin*

*Rate Cases*, 390 U.S. 747 (1968).  Gas "of lower pressure must be compressed to raise its pressure above that of the pipeline which it is entering."  *Re Area Rate Proceeding*, 34 F.P.C. at 224.

## II. Factual Background.

Range is a natural gas exploration and production company focusing on the development of the Marcellus shale formation in Pennsylvania.  JA__ (Joint Complaint P 6).  Texas Eastern and Columbia Gulf are interstate natural gas companies that each own and operate their own FERC-jurisdictional pipeline systems.  JA__ (Joint Complaint PP 7, 8).  Range is a firm shipper on both Texas Eastern and Columbia Gulf, *i.e.*, Range holds rights to a specified amount of mainline pipeline capacity and to a specified amount of capacity at specific receipt and delivery points, with such capacity rights "not subject to a prior claim by another customer or another class of service and receives the same priority as any other class of firm service."  18 C.F.R. § 284.7(a)(3) (2022).  For this firm service, Range pays reservation charges, *i.e.*, "a fee that firm natural gas shippers pay in order to guarantee in advance that capacity will be available when they need it."  *Texas Eastern Gas Transmission, LP*, 179 FERC ¶ 61,201, at P 5 n.14. (2022).

### A. The Adair Interconnect.

Natural gas flows from Texas Eastern's pipeline system onto Columbia Gulf's system at the Adair Interconnect, in Adair County, Kentucky.  JA__ (Joint

Complaint P 11). Under long-term firm contracts with Texas Eastern and Columbia Gulf, Range has the right to transport 200,000 dekatherms/day of natural gas to and from the Adair Interconnect. JA__ (Joint Complaint PP 19-20). This transportation volume accounts for approximately 10 percent of Range's total natural gas production in the Marcellus Basin. JA__ (Joint Complaint P 19).

Texas Eastern's 30-inch system is comprised of three parallel transmission pipelines with differing diameters: the 30-inch Line 10, the 30-inch Line 15, and the 36-inch Line 25. JA__ (Joint Complaint P 11). All three lines have maximum allowable operating pressures ("MAOP") of 936 psig. *Id.*[1] Columbia Gulf's system is comprised of three transmission pipelines: the 30-inch Line 100, which has an MAOP of 935 psig; the 30-inch Line 200, which has an MAOP of 1,007 psig; and the 36-inch Line 300, which has an MAOP of 1,007 psig. JA__ (Joint Complaint P 11).

The Adair Interconnect is located between Texas Eastern's Danville Compressor Station and Tompkinsville Compressor Station. JA__ (Joint Complaint P 12) (visual depiction). The Adair Interconnect feeds gas into Columbia Gulf's 30-

---

[1] The MAOP is the highest pressure at which a pipeline segment can physically operate. *See, e.g., National Fuel Gas Supply Corp.*, 93 FERC ¶ 62,045, 64,062 (2000). The higher a pipeline's MAOP, the more gas it has the capacity to transport. *Id.* A pipeline's prevailing pressure—that is, the pressure it is operating under at any given time—is often much lower than its MAOP. *See, e.g., id.*

inch Line 200 and 36-inch Line 300 at a point between Columbia Gulf's Clementsville Compressor Station and Goodluck Compressor Station. *Id.*

### B.   Texas Eastern's tariff and applicable contracts.

Texas Eastern's delivery of Range's gas at the Adair Interconnect is governed by Texas Eastern's tariff, Columbia Gulf's tariff, and a series of interlocking contracts.

*Texas Eastern's Tariff.* Section 6.2 of Texas Eastern's tariff provides for its "Delivery Pressure Obligations." JA__ (Range Complaint P 17). It states that Texas Eastern "shall deliver Gas" at delivery points "at such pressures that are available at the Point of Delivery and resulting from [Texas Eastern] maintaining a discharge pressure of 750 pounds per square inch gauge at the nearest upstream compressor station." *Id.*

Section 17.1 of Texas Eastern's tariff defines a *force majeure* event to exclude events within the control of the party claiming suspension. JA__ (Range Complaint P 15). This section states, "[f]or the sole purpose of calculating Reservation Charge Adjustments, pursuant to Section 31.2 of Pipeline's General Terms and Conditions, outages due to scheduled or routine maintenance shall not be considered Force Majeure events." *Id.*

Section 31.1 of Texas Eastern's tariff states that a firm shipper's reservation charges will be decreased by an amount of the reservation charges that apply to the

transportation path properly nominated by the customer but not delivered by Texas Eastern.  JA__ (Range Complaint P 16).[2]

*Columbia Gulf's Tariff*.  As relevant here, Section 13(b) of Columbia Gulf's tariff states, "Shipper shall deliver gas or cause gas to be delivered to Transporter at the receipt points at a pressure sufficient to allow the gas to enter Transporter's pipeline as such pressure shall vary from time to time."  JA__ (Joint Complaint P 59).

*Range's Texas Eastern Contract.*  In 2017, FERC granted Texas Eastern a certificate for the Adair Southwest Expansion Project, which would provide up to 200,000 dekatherms/day of capacity to transport natural gas from Uniontown, Pennsylvania to the Adair Interconnect.  JA__ (Joint Complaint P 15).

In October 2017, Range and Texas Eastern entered into a contract for the delivery of 200,000 dekatherms/day, "commencing on the date that all the Adair Southwest Project facilities are placed into service."  JA__ (Joint Complaint PP 17, 19); *see also* Texas Eastern Extension Projects Tariff Filing, FERC Docket No. RP18-144-000, Ex. D (filed November 2, 2017) (Contract No. 911376-R2).  Texas

---

[2] A "nomination" is a request from a pipeline's customer to transport gas under a specific contract.  *See Coordination of the Scheduling Processes of Interstate Natural Gas Pipelines and Pub. Utilities*, 151 FERC ¶ 61,049, at P 6 (2015); *see also Kern River Gas Transmission Co.*, 139 FERC ¶ 61,044 (2012) ("[N]ominations" refer to the amount of gas a shipper has "scheduled" for delivery on a pipeline, "despite the fact that only the pipeline 'schedules' service.").

8

Eastern agreed to deliver the gas to Columbia Gulf at the Adair Interconnect. *Id.*, Ex. B (Point(s) of Delivery). And Texas Eastern commenced service on the Adair Southwest Expansion Project on May 1, 2018. JA__ (Joint Complaint P 18).

*Adair Interconnection Agreement.* Texas Eastern and Columbia Gulf entered into the Adair Interconnection Agreement in October 2006 and amended it in May 2013. JA__ (Joint Complaint P 13). Section 4.02(E) states: "Either Party, at its sole discretion, may operate their respective pipelines up to its MAOP at any time. Therefore, both Parties, must in order to be assured of having the physical capacity to deliver/receive gas through the interconnection, have the capacity for delivering/receiving gas to such MAOP." JA__ (Adair Interconnect Agreement, Joint Complaint Ex. 3, at 3).

### C. Texas Eastern's operational problems begin.

#### 1. Gulf XPress Project.

In December 2017, FERC issued a certificate to Columbia Gulf for the Gulf XPress Project. JA__ (Joint Complaint P 23). The project added compression to Columbia Gulf's pipeline both upstream and downstream of the Adair Interconnect. *Id.* Although it did not result in any increase to Columbia Gulf's MAOP, after the Gulf XPress Project was placed into service, Columbia Gulf's system was fully subscribed and designed to operate at MAOP, without flexibility to accommodate gas delivered into the Adair Interconnect at pressures lower than Columbia Gulf's

9

MAOP.   JA__ (Joint Complaint P 25).   Texas Eastern took no action in the certification process to intervene, comment upon, or protest the Gulf XPress Project. *Id.*

In mid-2018, Texas Eastern informed Range that it may not be able to deliver gas from Texas Eastern into Columbia Gulf at the Adair Interconnect due to the potential for higher operating pressures on Columbia Gulf attributable to the Gulf XPress Project.  JA__ (Joint Complaint P 26).  In response, Range sent Texas Eastern a letter asserting that it was Texas Eastern's "obligation" to "overcome Columbia Gulf's prevailing line pressure at Adair in order to deliver Range's gas into Columbia Gulf."  JA__ (Oct. 30, 2018 Range Letter, Joint Complaint Ex. 5).  Texas Eastern replied that it "respectfully disagrees with [Range's] characterizations" of the "respective parties' obligations," asserting that that it was not required to send Range's gas at pressures adequate to enter Columbia Gulf's pipeline system.  JA__ (Nov. 8, 2018 Texas Eastern Letter, Joint Complaint Ex. 6).  Texas Eastern concluded that it would look into "potential ways to address [Range's] concerns," but claimed no legal requirement to do so.  *Id.*; *see also* JA__ (Joint Complaint P 28).  Texas Eastern took no further action to address Range's concerns.  JA__ (Joint Complaint P 29).  Instead, Texas Eastern continued to allow nominations at the Adair Interconnect, despite its inability to perform on the them, forcing Columbia

Gulf to take action in order to address the shortfall.  *See* JA__ (July 23, 2021 Letter,

Joint Complaint Ex. 18); JA__ (August 6, 2021 Letter, Joint Complaint Ex. 22).

> ### 2. *The Pipeline and Hazardous Materials Safety Administration takes remedial action, forcing Texas Eastern to reduce its operating pressure.*

In 2019 and 2020, Texas Eastern experienced line failures that released natural

gas near compressor stations near the Adair Interconnect and forced the Pipeline and

Hazardous Materials Safety Administration ("PHMSA") to act.  JA__ (Joint

Complaint PP 30-31).

To begin, in August 2019, Texas Eastern's Line 15 failed, resulting in the

release of approximately 66 million cubic feet of gas.  In response, PHMSA directed

Texas Eastern to implement operating pressure restrictions on Lines 10, 15, and 25

between the Danville and Tompkinsville Compressor Stations, which are the line

segments that feed into the Adair Interconnect.  JA__ (Corrective Action Order, Joint

Complaint Ex. 7, at 1-2, 5); JA__ (Joint Complaint P 30).  These restrictions limited

Texas Eastern to operating the lines at 80 percent of the actual operating pressure in

effect prior to the line failure, or 740 psig (*i.e.,* 80 percent of the 925 psig in effect

immediately prior to the August 1 failure).  JA__ (Joint Complaint P 30).

Then, in May 2020, Texas Eastern experienced another line failure, this time

on Line 10 near Hillsboro, Kentucky, resulting in the release of approximately 52

million cubic feet of natural gas.  JA__ (Joint Complaint P 31).  After Texas Eastern

completed its PHMSA-ordered remediation work in December 2020, PHSMA approved Texas Eastern to recommence operations at full operating pressures. JA__ (Joint Complaint P 32). Texas Eastern was then required to request approval from PHMSA every 90 days to continue operations at full MAOP. *Id.*; JA__ (Critical Notice E-mail, Joint Complaint Ex. 9).

PHMSA granted Texas Eastern a single, temporary 90-day waiver but declined to grant a second. JA__ (Joint Complaint P 33). Texas Eastern was therefore required to reimpose the 20 percent pressure restrictions on Lines 10 and 15, effective June 1, 2021. *Id.*[3]

### D. Twice, Texas Eastern's failure to send gas at adequate pressures caused Columbia Gulf to curtail service.

#### 1. The 2019 Curtailment.

In August 2019—the same month that Texas Eastern's Line 15 failed and after numerous communications with Texas Eastern—Columbia Gulf began posting critical notices stating that Texas Eastern's inability to send gas into Columbia Gulf's system at Columbia Gulf's prevailing operating pressures created a significant imbalance between Texas Eastern's pipeline and Columbia Gulf's pipeline. JA__ (Joint Complaint P 36); JA__ (Columbia Gulf Notices, Joint Complaint Ex. 10, at 1-2). That imbalance came to a head in November. From

---

[3] At the time the complaints were filed, none of Texas Eastern's three lines remained subject to PHSMA pressure restrictions. JA__ (Joint Complaint P 33).

November 5 through November 11, 2019, Columbia Gulf was forced to curtail service—that is, reduce Range's nominations—due to Texas Eastern's inability to send gas at adequate pressures to enter Columbia Gulf's pipeline at the Adair Interconnect ("2019 Curtailment").  JA__ (Joint Complaint P 34); JA__ (Order P 17).[4]

On November 5, 2019, the pressure imbalance caused Columbia Gulf to reduce nominations at the Adair Interconnect from 200,000 dekatherms/day to 60,000 dekatherms/day.  JA__ (Joint Complaint P 36); JA__ (Columbia Gulf Notices, Joint Complaint Ex. 10, 1-2).  It was not until November 11, 2019 that Columbia Gulf was able to fully restore receipts to 200,000 dekatherms/day.  *Id.* Because Range's capacity on Texas Eastern and Columbia Gulf flows through the Adair Interconnect, that reduction directly curtailed Range's nominations on both pipelines, preventing Range from selling the gas it had worked to produce.  JA__ (Joint Complaint P 36).

Columbia Gulf did not change or exceed its MAOP during the 2019 Curtailment.  JA__ (Joint Complaint P 37).  In fact, Columbia Gulf's system operating pressure averaged 683 psig at the Adair Interconnect during this period— well below its 1,007 MAOP.  *Id.*  And even then, Texas Eastern could not "generate

---

[4] When Range's nominations were reduced, it meant that Range was unable to deliver a portion of the 200,000 Dkh/day that it has a contractual right to deliver. *See* JA__ (Joint Complaint PP 19, 20).

sufficient pressures to deliver gas into the Columbia system." JA__ (Joint Complaint P 37). To end the curtailment, draw down the pressure imbalance, and accommodate Texas Eastern, Columbia Gulf ran its pipeline in abnormal operations to reduce its line pressure even further. *Id.*; *see also* JA__ (Joint Complaint P 66) (noting Columbia Gulf's "system modifications"); Trillo Standing Affidavit PP 10, 13 (an "abnormal" operating mode is required to receive Texas Eastern's lower-pressure gas).

### 2. The 2021 Curtailment: Receipts go to zero, as Texas Eastern claims force majeure.

In May 2021, Texas Eastern and Columbia Gulf notified Range that, due to Texas Eastern's failure to send volumes at pressures sufficient to enter the Columbia Gulf, Columbia Gulf would likely need to curtail flows at the Adair Interconnect— again. JA__ (Joint Complaint P 38); JA__ (Order P 21).

And from May 27 through July 29, 2021, the pressure deficit between Texas Eastern's delivering pipeline and Columbia Gulf's receiving pipeline caused Range to experience a substantial interruption in service ("2021 Curtailment"). JA__ (Joint Complaint P 39). For 23 days of this period, Texas Eastern did not deliver *any* of Range's gas. JA__ (Compressor Readings, Joint Complaint Ex. 11) (showing 23 days of 0 flows).

On May 26, 2021, Columbia Gulf posted a critical notice, after several more failed conversations with Texas Eastern, reporting that "for the purposes of

imbalance management," it had to reduce total receipt point capacity at the Adair Interconnect to 140,000 dekatherms/day until further notice.  JA__ (Columbia Gulf Notices, Joint Complaint Ex. 10, at 2-3).  At that point, the interconnection's full operating capacity was 203,542 dekatherms/day.  JA__, __ (Joint Complaint PP 40, 50).

Two days later, Texas Eastern claimed *force majeure* citing the PHMSA-required pressure reductions for its 30-inch system between the Kosciusko Compressor Station and the Uniontown Compressor Station, JA__ (May 28, 2021 Force Majeure Critical Notice, Joint Complaint Ex. 12); JA__ (Joint Complaint P 41)—two compressor stations that lie on either side of the Adair Interconnect (with Kosciusko upstream of the Tompkinsville Compressor Station and Uniontown downstream of the Danville Compressor Station), JA__ (Joint Complaint P 41 n.54). But Texas Eastern's claimed *force majeure* started on June 1, several days after PHMSA declined to renew Texas Eastern's request for temporary approval—which required Texas Eastern to reduce its MAOP by 20 percent, JA__ (May 28, 2021 Force Majeure Critical Notice, Joint Complaint Ex. 12); JA__ (May 28, 2021 Force Majeure Critical Notice E-mail, Joint Complaint Ex. 9)—and well after Columbia Gulf posted its critical notice regarding Texas Eastern's failure to keep the Adair Interconnect in balance.

Later that week, Columbia Gulf issued superseding notices reporting that Texas Eastern's continued underperformance necessitated *additional* reductions to receipt point capacity.  JA__ (Joint Complaint P 42).  Meanwhile, Texas Eastern issued a notice explaining PHMSA had denied its second request for a temporary waiver, requiring Texas Eastern to reimpose the 20 percent pressure restrictions on Lines 10 and 15, effective June 1, 2021.  JA__ (June 4, 2021 Texas Eastern Critical Notice, Joint Complaint Ex. 15).

It went downhill from there.  Three days after Texas Eastern's PHMSA notice, Columbia Gulf reported that it had to reduce receipt capacity to *zero* dekatherms/day until further notice. JA__ (Joint Complaint P 45); JA__ (Columbia Gulf Notices, Joint Complaint Ex. 10, at 4).  Receipts were set to zero for the rest of the month. *Id.*

In July, however, the situation became more manageable.  In the beginning of July, Columbia Gulf increased receipt point capacity to 100,000 dekatherms/day. JA__ (Columbia Gulf Notice, Joint Complaint Ex. 17, at 2).  And by the end of the month, Columbia Gulf increased Range's capacity to 140,000 dekatherms/day. JA__ (Joint Complaint P 49); JA__ (July 26, 2021 Columbia Gulf E-mail to Range, Joint Complaint Ex. 19).

Around that same time, Texas Eastern issued a notice stating that PHMSA had approved its request to recommence service at full operating pressure.  JA __

16

(Texas Eastern Critical Notice, Joint Complaint Ex. 20). And at the end of July, Columbia Gulf issued a notice stating that it would restore the full operating capacity at the Adair Interconnect. JA__ (Joint Complaint P 50). Texas Eastern lifted the claimed *force majeure* on August 5, which had remained in place since the end of May. JA__ (Texas Eastern Critical Notice, Joint Complaint Ex. 21).

The service curtailments prevented Range from selling its natural gas and cost the company more than $5.5 million. JA__ (Range Complaint P 4); JA__ (Range Financial Loss, Joint Complaint Ex. 23).

### E. Texas Eastern asserts that it has no minimum pressure obligation.

During the 2021 Curtailment, Range and Columbia Gulf requested that Texas Eastern "take prompt steps to address persistent and ongoing operational issues" at the Adair Interconnect. JA__ (July 23, 2021 Letter, Joint Complaint Ex. 18). Range and Columbia Gulf stated that "deliveries by Texas Eastern to Columbia Gulf on behalf of [Range] are consistently at operating pressures substantially below Columbia Gulf's [MAOP], and are also below prevailing operating pressures on Columbia Gulf's system as they exist from time to time." *Id.* The letter explained that the Adair Interconnection Agreement, Columbia Gulf's tariff, and FERC's past precedent obligated Texas Eastern to send gas at pressures sufficient to enter Columbia Gulf's system and advised that Columbia Gulf would pursue all

17

remedies—including a FERC complaint—if Texas Eastern's violations continued. *Id.*; *see also* JA__ (Joint Complaint P 48).

In response, Texas Eastern disclaimed any legal responsibility, asserting that it "does not have any contractual obligation to Columbia Gulf or Range to address such pressure differential, nor does a regulatory requirement exist that would impose such an obligation on Texas Eastern." JA__ (August 6, 2021 Letter, Joint Complaint Ex. 22).

## III.    Procedural History.

### A.    Range and Columbia Gulf file complaints with FERC against Texas Eastern.

In December 2021, Range and Columbia Gulf filed a joint complaint with FERC against Texas Eastern. *See* JA__-__ (Joint Complaint) (FERC Docket No. RP22-433-000). On that same day, Range filed its own FERC complaint against Texas Eastern, including the Joint Complaint as an attachment. *See* JA__-__ (Range Complaint) (FERC Docket No. RP22-435-000).

The Joint Complaint alleged that "Texas Eastern was unwilling to operate its system in a manner to provide sufficient pressure for deliveries through the Adair Interconnect during the Curtailments to allow for Range to flow volumes to and through the Adair Interconnect into Columbia Gulf." JA__ (Joint Complaint P 66). It highlighted that Section 4.02(E) of the Adair Interconnection Agreement requires

18

"both Parties" to have the physical capacity to deliver and receive gas at the other party's MAOP. JA__ (Joint Complaint P 13).

The Joint Complaint brought two major groups of claims. *First*, the Joint Complaint alleged that Texas Eastern's failure to send gas at adequate pressures to be delivered onto Columbia Gulf's system violated the Natural Gas Act and FERC's regulations. It alleged that Texas Eastern acted in an unduly discriminatory manner by providing firm service deliveries for similarly situated firm shippers at geographically proximate points, while providing no firm service to Range, in violation of Part 284 of FERC's regulations. JA__-__ (Joint Complaint PP 69-70). Additionally, the Joint Complaint alleged that Texas Eastern improperly claimed *force majeure*, which limited the reservation charge-credits for which Range was eligible. JA__-__ (Joint Complaint PP 66-68).

*Second*, the Joint Complaint alleged that Texas Eastern's failure to send gas at high enough pressures to enter Columbia Gulf's pipeline violated FERC's precedent in *Northern Natural*, 109 FERC ¶ 61,201. JA__-__ (Joint Complaint P 72). In *Northern Natural*, FERC ruled that if the receiving pipeline's "pressure remains below the maximum allowed, and the [delivering pipeline] proves unable to deliver gas," then "the responsibility to make deliveries will lie with the [delivering pipeline], not [the receiving pipeline]." JA__ (Joint Complaint P 73). Separately, *Northern Natural* held that the receiving pipeline's tariff, which required shippers to

19

send gas at pressures sufficient to enter the receiving pipeline's system, "controls" the dispute between the delivering and receiving pipelines. JA__ (Joint Complaint P 75). Under either rule, the Joint Complaint alleged that "the responsibility for addressing the pressure issues at the Adair Interconnect lies with Texas Eastern, not Range or Columbia Gulf." *Id.*

Range's separate complaint brought similar, though distinct, claims. Among them, Range alleged that Texas Eastern violated Section 6.2 of its tariff, which requires it to "maintain[ ] a discharge pressure of 750" psig at the nearest upstream compression station. JA__ (Range Complaint P 24). Range's complaint alleged that during the 2019 Curtailment, Columbia Gulf's prevailing pressure was well below 750 psig, and Texas Eastern could not even meet that. *Id.* (incorporating JA__ (Joint Complaint P 37)). Range accordingly asserted that Texas Eastern "violated the express provisions" of its tariff. JA__ (Range Complaint P 24).

### B. FERC denies the complaints on legal grounds and without holding an evidentiary hearing.

Texas Eastern filed answers and motions to dismiss both Range's complaint and the Joint Complaint. It argued that it had "no contractual or other requirement" to "operate at sufficient pressure to allow gas to flow through the Adair Interconnect." JA__ (Motion to Dismiss Joint Complaint 2-3).

FERC agreed and dismissed both complaints without holding a hearing or permitting discovery. FERC's order dismissing the complaints identified the legal

issue as: whether "Texas Eastern has any obligation to Range and/or Columbia Gulf to deliver natural gas at a specific pressure at the Adair Interconnect." JA__ (Order P 57). It ruled that Texas Eastern did not. *See* JA__ (Order P 58) ("Texas Eastern has not committed any [regulatory] violations or breached any [contractual] obligations."). FERC stated that under Section 6.2 of Texas Eastern's tariff, Texas Eastern "is only required to deliver natural gas at the available line pressures at the time." JA__ (Order P 58). And it ruled that under the Adair Interconnect Agreement, "there is no obligation on the part of Texas Eastern to deliver gas to Columbia Gulf at specified line pressure." JA__ (Order P 64).

As for *Northern Natural*, FERC ruled this past precedent did not set a default rule where a delivering pipeline must send gas at pressures adequate for the receiving pipeline to actually receive it. *Id.* Similarly, FERC ruled that Section 13(b) of Columbia Gulf's tariff, which concerns "shippers," does not apply to Texas Eastern because Texas Eastern is not a "shipper." *Id.*

Next, FERC ruled that Range could not be similarly situated to other firm shippers because Range holds all the capacity at the Adair Interconnect and, therefore, could not receive a lower priority service at that point. JA __ (Order P 60). In any event, FERC determined that Texas Eastern met its Part 284 obligations by scheduling the gas that Columbia Gulf was willing to take. *Id.* And finally, FERC ruled that Range's claim that Texas Eastern improperly claimed *force majeure* was

21

legally irrelevant because Texas Eastern "has no pressure obligation at the Adair Interconnect."  JA__ (Order P 65).

## C.  FERC denies Range's and Columbia Gulf's requests for rehearing.

Range and Columbia Gulf each filed requests for rehearing.  First, Range asserted that FERC erred by interpreting Section 6.2 of Texas Eastern's tariff to require it solely "to deliver natural gas at the available line pressures at the time." JA__ (Range Rehearing Request 20 (citing Order P 58)).  Range explained that ruling ignored Section 6.2's plain directive that Texas Eastern must "maintain[ ] a discharge pressure of 750 [psig] at the nearest upstream compressor station."  *Id.*

On rehearing, FERC refused to engage that legal argument.  *See* JA__ (Rehearing Order P 9).  Instead, it ruled that Range's complaint did not include this Section 6.2 theory, and FERC therefore need not consider it.  *Id.*

Next, Columbia Gulf challenged FERC's ruling that the Adair Interconnect Agreement does not create an obligation for Texas Eastern to "deliver gas at the Adair Interconnect at pressures adequate to move gas onto Columbia Gulf's system." JA__ (Columbia Gulf Rehearing Request 9) (referring to JA__ (Order P 58)). Columbia Gulf explained that FERC ignored the second sentence of Adair Interconnection Agreement Section 4.02(E), which creates a minimum pressure obligation by requiring each party to have the "physical capacity" to deliver and receive gas up to the other party's MAOP.  *Id.*

FERC rejected that, too.  It ruled that because Section 4.02(E) first sentence states that either party, "at its *sole discretion*, may operate up to its MAOP *at any time*," that section did not impose any requirement to deliver or receive gas at the other party's MAOP.  JA__ (Rehearing Order P 11).  In addition, FERC ruled it need not consider Columbia Gulf's Section 4.02(E) claim because it was not properly pled in the Joint Complaint.  JA__ (Rehearing Order P 10).

Range and Columbia Gulf then challenged FERC's ruling that *Northern Natural* does not require Texas Eastern to deliver gas at pressures adequate to enter Columbia Gulf's pipeline.  Columbia Gulf explained that in *Northern Natural*, FERC dismissed the delivering pipeline's claim because "the responsibility to make changes to make deliveries possible will lie with Northern Natural," which was the delivering pipeline, "not ANR," the receiving pipeline.  JA__ (Columbia Gulf Rehearing Request 12) (quoting *Northern Natural*, 109 FERC ¶ 61,201, at P 25).  Columbia Gulf argued that the same rationale applies here, and that under that rationale, Texas Eastern has an obligation to operate its pipeline at pressures to "make deliveries possible."  *Id.*  In response, FERC ruled that because the delivering pipeline's "obligations were not before the Commission" in *Northern Natural*, FERC's previous statements that delivering pipelines do have minimum pressure obligations "are dicta" that need not be followed.  JA__ (Rehearing Order P 12).

Range, meanwhile, argued that FERC's order failed to explain why the receiving pipeline's "shipper" tariff language in *Northern Natural* applied to the delivering pipeline, but Columbia Gulf's "substantively identical tariff language" does not apply to Texas Eastern. JA__ (Range Rehearing Request 36). In response, FERC ruled that "Complainants do not contend on rehearing that Texas Eastern is a 'Shipper' of gas," which FERC ruled, was "sufficient to dispose" of Range's *Northern Natural* argument. JA__ (Rehearing Order P 13).

As for Range's argument that it was similarly situated to shippers that received higher priority service, Range highlighted FERC's past precedent in *El Paso Natural Gas Co*., 99 FERC ¶ 61, 244 (2002), for additional support. JA __ (Range Rehearing Request 24-26). But on rehearing, FERC claimed that *El Paso* was inapplicable because, in FERC's view, the pipeline in that case lacked sufficient capacity to schedule all firm service, which ran afoul of Part 284's requirement that firm service not be subject to a prior claim by another customer. JA__ (Rehearing Order P 14). FERC also ruled that geographic proximity is insufficient to demonstrate that shippers are similarly situated. JA __ (Rehearing Order P 15).

Lastly, Range argued that FERC failed to consider the evidence surrounding Texas Eastern's declaration of *force majeure*, particularly during the 2021 Curtailment. JA __ (Range Rehearing Request 30-33). Range argued that FERC failed to explain why it relied on one statement in an affidavit from Berk Donaldson,

a Texas Eastern employee, but ignored directly contradictory statements from the same affidavit. JA __ (Range Rehearing Request 28-30). FERC ruled that a further inquiry into whether Texas Eastern properly claimed *force majeure* was unnecessary because (1) Range was not entitled to reservation charge credits where Columbia Gulf refused to accept volumes from Texas Eastern; and (2) Texas Eastern has already provided credits to Range, and Range has not disputed the level of credits provided. JA __ (Rehearing Order P 16).

This petition follows.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reprinted in the addendum.

## STANDARD OF REVIEW

This Court reviews challenges to FERC's orders "under the arbitrary and capricious standard of the Administrative Procedure Act." *Missouri Pub. Serv. Comm'n v. FERC*, 215 F.3d 1, 3 (D.C. Cir. 2000).

## SUMMARY OF ARGUMENT

I.    FERC misinterpreted the plain language of Section 6.2 of Texas Eastern's tariff and Section 4.02(E) of the Adair Interconnection Agreement, each of which imposes a minimum pressure obligation onto Texas Eastern. *First*, FERC's order ruling that Section 6.2 does not create a minimum pressure obligation does not reference the sentence stating Texas Eastern has a duty to "maintain[ ] a discharge pressure of 750 [psig] at the nearest upstream compressor station." *See* JA__ (Order

P 58); *see also* JA__ (Section 6.2 of Texas Eastern's tariff). That is Section 6.2's key phrase, and FERC's order ignoring it was arbitrary and capricious.

On rehearing, FERC simply asserted that Range's complaint did not properly plead this Section 6.2 claim—declining to defend its flawed textual interpretation. But that too was unreasonable. Paragraphs 24 and 62 of Range's complaint lay out the relevant Section 6.2 provision that Texas Eastern violated and explain how and when Texas Eastern violated it. Nothing more is required to survive a motion to dismiss.

*Second*, FERC's order ruling that Section 4.02(E) does not impose a minimum pressure obligation also ignored that provision's key sentence. Section 4.02(E) states that each party may operate up to its MAOP, and further requires that each party has the "physical capacity" to deliver gas at the other's MAOP—plainly requiring Texas Eastern to have the physical capacity to meet Columbia Gulf's MAOP of 1,007 psig. FERC's contrary ruling ignores Section 4.02(E)'s text, and is unreasonable by any measure.

FERC's alternative rationale dismissing Range's and Columbia Gulf's Section 4.02(E) claim because it was not pled in the complaint is no reason to deny this petition. *See* JA__ (Rehearing Order P 11). The Joint Complaint's failure to formally include Range's and Columbia Gulf's Section 4.02(E) claim is a purely technical defect, and FERC's standard practice allows amended complaints under

26

such circumstances.  Once FERC's legal error concerning the meaning of Section 4.02(E) is corrected, FERC should decide in the first instance how to deal with the Range's and Columbia Gulf's meritorious claim.

II.     FERC failed to adequately explain why *Northern Natural* does not require Texas Eastern to deliver gas at pressures sufficient to enter Columbia Gulf's pipeline.  For starters, *Northern Natural*'s rationale that a receiving pipeline is not obligated to make changes to accommodate a delivering pipeline's lower pressure *because that obligation lies with the delivering pipeline* squarely applies in this case. Instead of explaining why that rationale does not apply, or explaining why FERC is now abandoning its prior precedent, FERC simply asserts that *Northern Natural* never issued such a holding in the first place.  But FERC's rationale is what matters, and its failure to distinguish or knowingly depart from the principles it previously applied flunks arbitrary-and-capricious review.

Similarly, FERC offered no reason at all for why substantially identical tariff language that *Northern Natural* applied against a delivering pipeline should not also be applied against Texas Eastern in this case.  FERC's failure to explain why its previous tariff interpretation does not apply here is arbitrary and capricious.

III.     Separately, FERC unreasonably failed to subject key factual questions to the benefit of discovery proceedings or to scrutiny at an evidentiary hearing, namely whether Range was similarly situated to other firm shippers on the Texas

27

Eastern system and whether Texas Eastern properly declared a *force majeure* event during the 2021 Curtailment. By denying a hearing and preventing discovery, FERC ignored lines of inquiry that it has elsewhere acknowledged are "fact intensive," failed to wrestle with its own prior precedent, and unreasonably accepted contradictory statements from Texas Eastern's witnesses.

## STANDING

Range's Article III standing is self-evident. It sought over $5 million in damages from Texas Eastern for its failures to satisfy its contractual and regulatory minimum pressure obligations. JA__ (Range Complaint PP 4, 66). Such "actual economic loss" is a concrete and particularized injury. *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 9 (D.C. Cir. 2015). Range's uncompensated loss is "fairly traceable" to FERC's denial of its complaints. *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C Cir. 2017). And remand from this Court back to FERC creates "a significant increase in the likelihood that [Range] would obtain relief that directly redresses" its economic injury. *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 7 (D.C. Cir. 2005) (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)).

Columbia Gulf also has Article III standing to challenge FERC's denial of its request that Texas Eastern be required to modify its compression system so that its prevailing pressure meets or exceeds Columbia Gulf's. JA__ (Joint Complaint P 89). The 2019 and 2021 Curtailments caused Columbia Gulf significant amounts

of operational, administrative, and financial harm.  *See* Trillo Standing Affidavit PP

6-8.  That harm amounts to an injury-in-fact in two ways.

    *First*, absent intervention from FERC, there is a "substantial probability" that

this same harm will occur in the near future—satisfying Article III's injury-in-fact

requirement.  *See Sierra Club v. Jewell*, 764 F.3d 1, 7 (D.C. Cir. 2014).  To mitigate

the risk of future curtailments Columbia Gulf has isolated a section of its pipeline to

compress Texas Eastern's gas and increase its pressure to meet Columbia Gulf's

prevailing line pressures.  *See* Trillo Standing Affidavit P 10.  But starting October

1, 2022, Columbia Gulf has sold more of its capacity—with FERC's express

approval—and will likely no longer "be able to consistently use abnormal operations

to increase the pressure of Texas Eastern's gas," without shorting other customers.

*Id.* P 12.  If Texas Eastern does not meet or exceed Columbia Gulf's prevailing

pressure, and Columbia Gulf is no longer able to consistently compress Texas

Eastern's gas, as is expected, future disruptions to flow and more curtailments are

imminent and unavoidable.  *Id.* PP 9, 12.

    *Second*, by isolating a section of its pipeline, Columbia Gulf has incurred

expenses to "mitigate" the "substantial risk of future" curtailments.  *In re U.S. Off.*

*of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 59 (D.C. Cir. 2019) (holding

such expenses satisfy Article III's "injury in fact" requirement).  Isolating a section

of Columbia Gulf's pipeline is necessary to raise Texas Eastern's gas pressure high

enough to enter Columbia Gulf's system and to mitigate the risk of future curtailments. Trillo Standing Affidavit PP 10, 13. To accommodate Texas Eastern's lower pressure, Columbia Gulf has operated in this abnormal mode for years and almost constantly since October 1, 2022. *Id.* P 13. Isolating a section of Columbia Gulf's pipeline requires one of Columbia Gulf's employees, the local gas controller, to constantly monitor pressure differentials between Texas Eastern's system and Columbia Gulf's system and manually operate a valve to enter into abnormal operations when conditions are appropriate. *Id.* P 10. This monitoring significantly adds to the gas controller's day-to-day responsibilities and burdens. *See Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 458 (D.C. Cir. 2012) (increased "compliance costs" constitute injury-in-fact). Moreover, isolating Columbia Gulf's pipeline requires additional hours of run time for Columbia Gulf's compressor units, more frequent service intervals, and more work hours for operations personnel—directly impacting Columbia Gulf's bottom line. Trillo Standing Affidavit P 11.

The modifications to Texas Eastern's system that Columbia Gulf requested in the Joint Complaint would practically eliminate both the risk of future curtailments and the need for Columbia Gulf to make these burdensome system modifications. *Id.* PP 14, 15. Columbia Gulf's harms are therefore fairly traceable to FERC's order

dismissing the Joint Complaint and are redressable by an order from this Court remanding back to FERC.  *See Attias*, 865 F.3d at 629; *Nat'l Parks*, 414 F.3d at 7.

## ARGUMENT

**I.  FERC'S RULINGS THAT TEXAS EASTERN DID NOT VIOLATE SECTION 6.2 OF ITS TARIFF AND SECTION 4.02(E) OF THE ADAIR INTERCONNECTION AGREEMENT ARE ARBITRARY AND CAPRICOUS.**

This Court reviews FERC's interpretation of a tariff and related contracts under the APA's arbitrary and capricious standard.  That standard considers "*de novo* whether the relevant language unambiguously addresses the matter at issue." *NextEra Desert Ctr. Blythe, LLC v. FERC*, 852 F.3d 1118, 1121 (D.C. Cir. 2017) (quoting *Ameren Servs. Co. v. FERC*, 330 F.3d 494, 498 (D.C. Cir. 2003)).  "If so, the language controls for [this Court] must give effect to the unambiguously expressed intent of the parties." *Id.*

Section 6.2 of Texas Eastern's tariff plainly imposes a minimum pressure requirement of 750 psig at the nearest upstream compressor station.  JA__ (Texas Eastern Tariff Section 6.2).  Separately, Section 4.02(E) of the Adair Interconnection Agreement requires Texas Eastern to have the "capacity" to deliver gas at pressures as high as Columbia Gulf's MAOP of 1,007 psig.  JA__ (Adair Interconnection Agreement Section 4.02(E)).  FERC ignored both unambiguous provisions and came to the opposite conclusion; either error merits remand.  *See Idaho Power Co. v.*

31

*FERC*, 312 F.3d 454, 462 (D.C Cir. 2002) ("The fact that FERC's orders directly conflict with the plain meaning of the tariff alone merits a reversal.").

> **A.    Section 6.2 of Texas Eastern's tariff imposes a minimum pressure obligation, and FERC's contrary interpretation warrants remand.**
>
> > ### 1. *FERC's interpretation that Section 6.2 does not impose a minimum pressure obligation is plainly wrong.*

FERC misinterpreted Section 6.2 of Texas Eastern's tariff. That provision states that Texas Eastern "shall deliver Gas" at delivery points "at such pressures that are available at the Point of Delivery and resulting from [Texas Eastern] maintaining a discharge pressure of 750 pounds per square inch gauge at the nearest upstream compressor station." JA__ (Range Complaint P 17). Range explained that this provision creates a minimum pressure obligation of 750 psig for Texas Eastern. JA__ (Range Complaint P 24). FERC, however, ruled that under Section 6.2, the pipeline is "only required to deliver natural gas at the available line pressures at the time." JA__ (Order P 58).

By isolating Section 6.2's phrase "at such pressures that are available," FERC overlooked the following clause—in the *same sentence*—that requires the available pressures to result from Texas Eastern's maintenance of 750 psig discharge pressure. *Id.* Because FERC "inexplicably ignored" Section 6.2's key language— "maintaining a discharge pressure of 750 [psig]"—remand is warranted. *FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441, 449 (D.C. Cir. 2005); *see also*

*Louisiana Pub. Serv. Comm'n v. FERC*, 20 F.4th 1, 9 (D.C. Cir. 2021) ("[P]articular words should be considered, not as if isolated from the context, but in light of the obligations as a whole.") (quotation marks and citation omitted).

### 2. Remand is warranted because Range adequately pled its Section 6.2 claim.

On rehearing, FERC did not even attempt to defend its flawed interpretation of Section 6.2.  Instead, FERC invoked 18 C.F.R. § 385.206(b), which requires administrative FERC complaints to "identify the action or inaction" at issue and "explain how the action or inaction violates applicable statutory or regulatory requirements."  JA__ (Rehearing Order P 9 n.34 (quoting 18 C.F.R. § 385.206(b)). FERC ruled that Range's Section 6.2 claim failed to meet these pleading requirements, and on that basis, decided that it "need not consider" the claim.  JA__ (Rehearing Order P 9).

FERC is wrong.  Rule 206 is satisfied if complainants simply "identify and explain the alleged violation of the applicable statutory or regulatory requirements at issue."  *Midcontinent Indep. Sys. Operator, Inc.*, 146 FERC ¶ 61,212, at P 111 (2014).  Range's complaint satisfies each condition. Paragraph 24 specifically identifies the applicable legal requirement, stating: "Section 6.2 of the [General Terms and Conditions] of Texas Eastern's tariff requires Texas Eastern to deliver gas at pressures that 'are available at the Point of Delivery and resulting from Pipeline maintaining a discharge pressure of 750 pounds per square inch gauge

pressure at the nearest upstream compressor station.'"  JA__ (Range Complaint P 24); *see also id.* (summarizing that Texas Eastern "violated express provisions" of its "tariff").  One sentence later, Range identified when and how Texas Eastern violated that obligation: "[D]uring the Curtailments," Texas Eastern's prevailing pressure did not exceed 748.8 psig, even assuming the best conditions.  *Id.*  Range also referenced (and attached) Joint Complaint paragraph 37, *id.*, which alleged that Texas Eastern could not meet Columbia Gulf's prevailing pressure, which averaged 683 psig and reached as low as 553 psig during the 2019 Curtailment.  JA__ (Joint Complaint P 37).  At paragraph 62, Range's complaint restated this claim, stating "Texas Eastern includes minimum pressure requirements in its tariff," and that its "failure to maintain these minimum pressures" violates those conditions.  JA__ (Range Complaint P 62).  That meets Rule 206's requirements and then some.

FERC's rehearing order in a footnote stated that Range's Section 6.2 argument improperly requires "cross-referencing a chain of citations" in Range's complaint, the Joint Complaint, and Range's rehearing request.  JA__ (Rehearing Order P 9 n.37).  But both FERC and Texas Eastern understood the nature of Range's Section 6.2 claim before Range filed its rehearing request and without the need to cross-reference anything.  *Cf. Consol. Edison Co. of N.Y., Inc. v. FERC*, 347 F.3d 964, 973 (D.C. Cir. 2003) (allowing "tariff violation" claim to proceed, even though the complaint mislabeled it, because "FERC cannot reasonably argue that it lacked

notice of the tariff violation claim"). FERC's Order Dismissing Complaints recognized that Range's argument was (1) that Section 6.2 "requires Texas Eastern to deliver gas at pressures that 'are available at the Point of Delivery and resulting from Pipeline maintaining a discharge pressure of 750 pounds per square inch gauge pressure at the nearest upstream compressor station,'" and (2) that Texas Eastern violated that requirement. JA__ (Order P 32). Texas Eastern's motion to dismiss similarly responded to Range's argument that Section 6.2 creates a "minimum pressure obligation." *See* JA__ (Texas Eastern Motion to Dismiss 16).

Paragraph 24 of Range's complaint alleges that Texas Eastern's prevailing pressure fell far below 750 psig during the 2019 Curtailment, in violation of its Section 6.2 obligations. JA__ (Range Complaint P 24) (referencing JA__ (Joint Complaint P 37)). To the extent FERC dismissed Range's complaint for not also including details regarding the 2021 Curtailment in that same paragraph, FERC imposed far too high a pleading standard. Complaints must provide "*some explanation* as to how the Respondent's alleged action or inaction caused the violation" to survive a motion to dismiss—not highlight and group together every factual allegation that could conceivably support a given claim. *Citizens Energy Task Force & Save Our Unique Lands v. Midwest Reliability Org.*, 144 FERC ¶ 61,006, at P 39 (2014) (emphasis added). It was enough that paragraphs 24 and 62 of Range's complaint substantially comply with Rule 206, even though they

arguably could have included additional factual detail.  *See Cities of Anaheim, Azusa, Banning, Colton, Pasadena, and Riverside, Cal. v. Trans Bay Cable LLC*, 146 FERC ¶ 61,100, at P 22 (2014) (denying motion to dismiss where there was "substantial" compliance with Section 385.206(b)'s requirements); *Southwest Power Pool Inc. v. Midwest Indep. Sys. Operator, Inc.*, 146 FERC ¶ 61,231, at P 87 (2014) (same); *Luna Valley Solar I, LLC v. Pacific Gas & Elec. Co.*, 177 FERC ¶ 61,099, at P 24 (2021) (same); *Louisiana Pub. Serv. Comm'n v. Entergy Corp.*, 129 FERC ¶ 61,205, at P 26 n.20 (2009) (same).

Finally, FERC ruled that even if Range properly pled its Section 6.2 claim, its complaint does not "establish" that a "purported 10 psig pressure differential caused Columbia Gulf's refusal to accept Range's nominated gas." JA__ (Rehearing Order P 9 n.39).  But once again, FERC misreads Range's complaint.  Range's complaint attached and referred to paragraph 37 of the Joint Complaint, *see* JA__ (Range Complaint P 24), which directly alleges that Columbia Gulf's system operating pressure averaged 683 psig and reached as low as 553 psig during the 2019 Curtailment.  JA__ (Joint Complaint P 37).  The Joint Complaint then alleged Texas Eastern could not even meet those lower prevailing pressures.  *Id.*  Indeed, the Joint Complaint alleges that if Texas Eastern were reaching 740 psig, then it would have been "sufficient" to deliver the gas.  *Id.*  Even FERC's Order Dismissing Complaints recognized that allegation, stating that "The Complaints asserts that while Texas

36

Eastern was still subject to PHMSA orders, such pressure restrictions *should not have presented a problem* for Texas Eastern to generate sufficient pressures to deliver gas into the Columbia Gulf system at Adair during the 2019 Curtailment." JA__ (Order P 19) (emphasis added). Texas Eastern failed to deliver the gas, the Joint Complaint alleges, because it failed to meet even its lower adjusted MAOP of 740 psig. JA__ (Range Complaint P 24). And although the complaints do not allege Texas Eastern's precise psig during the Curtailments, that is for a good reason: It is information that Range and Columbia Gulf would receive in discovery.

Range thus alleged that Texas Eastern did not meet Columbia Gulf's average psig of 683, and its low-point of 553. JA__ (Range Complaint P 24). That is not a difference of 10 psig, as FERC asserted, but an average of at least *67 psig* and a high-point of *197 psig*, respectively. Imbalances that large *are* incrementally more disruptive to a receiving pipeline's operations and *did* make Range's "ever-increasing capacity reductions" even worse. JA__ (Range Complaint P 41); *see also Re Area Rate Proceeding*, 34 F.P.C. at 224 (the lower the gas pressure, the greater the "number of stages of compression" that the gas must be put through to enter a receiving pipeline); Trillo Standing Affidavit P 16. The Court should hold that Section 6.2 of Texas Eastern's tariff imposes a minimum pressure obligation of 750 psig and instruct FERC on remand to determine whether Texas Eastern's actions were consistent with that obligation. *See Cajun Elec. Power Coop., Inc. v. FERC*,

924 F.2d 1132, 1137 (D.C. Cir. 1991) (reversing FERC's summary dismissal of complainant's contract claim, and ordering a hearing, because FERC's "cursory treatment" of that claim "simply will not do").

**B.    FERC's Interpretation That Section 4.02(E) Of The Adair Interconnection Agreement Does Not Include A Minimum Pressure Obligation Is Plainly Incorrect And Warrants Remand.**

*1.    Section 4.02(E) imposes a minimum pressure obligation, and FERC's contrary interpretation is plainly wrong.*

 FERC misinterpreted the plain meaning of the Adair Interconnection Agreement Section 4.02(E), too.  Section 4.02(E) governs Texas Eastern's and Columbia Gulf's "physical capacity" responsibilities at the Adair Interconnect. JA__ (Adair Interconnect Agreement, Joint Complaint Ex. 3, at 3).  The first sentence states that "[e]ither Party, at its sole discretion, may operate their respective pipelines up to its MAOP at any time." JA__ (*Id.* at 9).  And the second sentence reads that "both Parties, must in order to be assured of having the physical capacity to deliver/receive gas through the interconnection, have the capacity for delivering/receiving gas to such MAOP." *Id.*  Together, Section 4.02(E) requires Texas Eastern to have the "physical capacity" to deliver gas at pressures up to Columbia Gulf's MAOP of 1,007 psig—setting a minimum pressure obligation.[5]

_____

 [5] Section 4.02(E)'s other language supports this interpretation.  If Texas Eastern's pressure does meet or exceed Columbia Gulf's pressure at the Adair Interconnect, then it is not able to "deliver[ ]" the gas. JA__ (Adair Interconnect

But FERC came to the opposite conclusion.  It interpreted Section 4.02(E)'s first sentence, that either party "at its sole discretion, may operate up to its MAOP at any time," to mean that Texas Eastern does *not* have "any minimum pressure obligations."  JA__ (Rehearing Order P 11).  That makes no sense.  This sentence allows Columbia Gulf and Texas Eastern to operate at their respective MAOPs— 1,007 psig for Columbia Gulf and 936 psig for Texas Eastern, JA__, __ (Joint Complaint PP 11, 33)—which are often much higher than the pipeline's prevailing pressure.  Section 4.02(E)'s first sentence thus permits either party to set its gas pressure to the *maximum* that its system will physically allow; it says nothing of Texas Eastern's "*minimum* pressure" obligation either way.  JA__ (Rehearing Order P 11) (emphasis added).

Moreover, FERC's analysis altogether ignores Section 4.02(E)'s second and critical sentence—a hallmark of unreasonable interpretation.  *FPL Energy*, 430 F.3d at 449 (remanding because FERC failed "to acknowledge the remainder" of the tariff section).  The second sentence requires Texas Eastern to have the "physical capacity" to "deliver" gas at pressures up to Columbia Gulf's MAOP, *see* JA__

---

Agreement, Joint Complaint Ex. 3, at 9); *see Re Area Rate Proceeding*, 34 F.P.C. at 224 ("Gas cannot enter a pipeline unless it is under greater pressure than the pipeline pressure at the point of entry.").

(Adair Interconnect Agreement, Joint Complaint Ex. 3, at 9), and FERC never explains how this language is consistent with its contrary interpretation.

Finally, in a footnote, FERC highlights that Section 10.01 of the Adair Interconnection Agreement provides that Texas Eastern is not obligated to deliver gas at all. JA__ (Rehearing Order P 11 n.44). But as Columbia Gulf has explained, whether the Adair Interconnect Agreement obligates Texas Eastern to deliver gas is irrelevant to whether, once Texas Eastern has chosen to schedule and deliver gas, it requires the company to send that gas at pressures sufficient to enter Columbia Gulf's system. JA__ (Columbia Gulf Rehearing Request 10). Once again, FERC offered no response. *See Cal. Pub. Utilities Comm'n v. FERC*, 20 F.4th 795, 803 (D.C. Cir. 2021) (remanding and holding that it "is well established that the Commission must 'respond meaningfully to the arguments raised before it.'") (citation omitted). FERC's interpretation of Section 4.02(E) is wrong and this Court should set it aside. *See S. Cal. Edison Co. v. FERC*, 415 F.3d 17, 21 (D.C. Cir. 2005) (remanding because the "language of the ISO Tariff at issue in this case is clear").

### 2. *Remand is warranted, despite FERC's alternative Rule 206 ruling.*

FERC provided another reason for dismissing this claim. It ruled Range's and Columbia Gulf's Section 4.02(E) argument was not "timely raised" because the Joint Complaint was "not grounded" on alleged violations of that agreement. JA__

(Rehearing Order PP 10, 11). Even accepting FERC's narrow reading of the Joint Complaint, remand is warranted.

When an agency commits "an error of law" and "has discretion to determine in the first instance how it should be rectified, the proper course is to remand the case for further agency consideration in harmony with the court's holding." *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365-366 (D.C. Cir. 1995) (quoting *Global Van Lines, Inc. v. ICC*, 804 F.2d 1293, 1305 n.95 (D.C. Cir. 1986)). Each condition is satisfied; remand is therefore warranted.

*First*, FERC committed a quintessential "legal error" when it misinterpreted Section 4.02(E). *E.g.*, *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022). Even FERC recognized that its disposition of this contractual claim is "legal in nature." JA__ (Rehearing Order P 11).

*Second*, FERC has discretion on how to address Range and Columbia Gulf's factual allegations and supporting evidence showing that Texas Eastern violated Section 4.02(E), when that provision is properly construed. *See Complaint Procedures*, 84 FERC ¶ 61,082, at **3 (1998) (FERC "will exercise its discretion to determine the sufficiency of a complaint"); *People of State of Cal. ex rel. Edmund G. Brown Jr., Atty. Gen. v. Powerex Corp.*, 139 FERC ¶ 61,210, at P 9 (2012) (FERC "controls its own dockets and has substantial discretion to manage its proceedings").

41

In the ordinary course, FERC permits complainants to file amended complaints to cure technical or procedural pleading deficiencies. *See NextEra Energy Res., LLC PSEG Cos. v. ISO New England Inc.*, 157 FERC ¶ 61,059, at PP 1, 7 (2016) ("procedural dismissal[s]" allow for further amendments); *Interstate Power & Light Co. v. ITC Midwest, LLC*, 135 FERC ¶ 61,162, at P 5 n.7 (2011) (amendments permitted unless FERC "reached and weighed the merits of the complaint"). Indeed, the only authority FERC cites for dismissing Range's and Columbia Gulf's Section 4.02(E) claim is *Sunflower Electric Power Corp. v. Kansas Municipal Energy Agency & Municipal Power Pool, Inc.*, 148 FERC ¶ 61,022, at P 39 & n.75 (2014). *See* JA__ (Rehearing Order P 10 n.42). And *Sunflower*, in the very footnote that FERC cites, states that "while a complainant may not refine its complaint through an answer to an answer, a complainant may subsequently amend or supplement its complaint." 148 FERC ¶ 61,022, at P 39 & n.75.

That is likely what would happen here—once FERC's Section 4.02(E) legal error is corrected. The only purported pleading defect was not including Section 4.02(E) in the Joint Complaint's formal list of statutory and regulatory violations. *See* JA__ (Joint Complaint P 60); *see also* JA__ (Rehearing Order P 10 & n.41 (citing this paragraph of the Joint Complaint)). The Joint Complaint provided extensive factual detail on how Texas Eastern's gas pressure was not meeting Columbia Gulf's MAOP or its prevailing pressure. *E.g.*, JA__ (Joint Complaint

PP 34, 37) (2019 Curtailment); JA__ (Joint Complaint P 39) (2021 Curtailment). It also included Section 4.02(E)'s applicable language. JA__ (Joint Complaint P 13); *see also* JA__ (Order P 51) (describing Texas Eastern's Section 4.02(e) textual arguments). The Joint Complaint's pleading defect is purely technical and procedural, easily cured with a simple re-labeling of Range's and Columbia Gulf's claims and re-organization of their factual allegations.

FERC's treatment of a technical pleading defect on what it believed was an *unmeritorious* contract claim sheds no light on how it would treat that technical defect on a claim it knew was *meritorious*. Indeed, FERC's primary rationale for dismissing the Joint Complaint was that Texas Eastern has no contractual or regulatory "obligation to Range and/or Columbia Gulf to deliver natural gas at a specific pressure at the Adair Interconnect." JA__ (Order P 57); *see also* JA__ (Order P 58) (Texas Eastern does not have "any contractual obligations to deliver Range's natural gas to the Columbia Gulf system at the Adair Interconnect at any specific pressure"). If this Court corrects FERC's misinterpretation of Section 4.02(E), that primary rationale collapses, and FERC would likely not treat any such minor pleading defects in the same way. *See Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1149 (D.C. Cir. 2014) (remanding because the Court could not "confidently say[] that the agency would have resolved the [petition] in the same manner absent those errors"). The Court should remand so

that FERC can decide in the first instance how to address Range's and Columbia Gulf's factual allegations showing that Texas Eastern violated its Section 4.02(E) obligations.

## II. FERC SEPARATELY FAILS TO JUSTIFY ITS DEPARTURES FROM *NORTHERN NATURAL*.

Even if Texas Eastern did not violate its contractual obligations, FERC's prior precedent in *Northern Natural* requires Texas Eastern to make modifications to ensure it delivers gas at a pressure sufficient to enter Columbia Gulf's system. 109 FERC ¶ 61,201.

### A. FERC unreasonably departed from *Northern Natural*'s default rule that delivering pipelines must deliver gas at sufficient pressure.

To pass arbitrary and capricious review, FERC must either "persuasively distinguish[]" or "knowingly abandon[]" any prior inconsistent precedent. *Southwest Airlines Co. v. FERC*, 926 F.3d 851, 859 (D.C. Cir. 2019). But with *Northern Natural*, FERC did neither.

In *Northern Natural*, a delivering pipeline, Northern Natural Gas, objected to the increase in operating pressure from a receiving pipeline, ANR Pipeline. Northern Natural's complaint asserted that it—as a delivering pipeline—"should not have to bear the financial burden of modifying its current facilities and operations in order to comply with [the receiving pipeline's] new higher pressure requirements." *Northern Natural*, 109 FERC ¶ 61,201, at P 7.

44

FERC disagreed.  It held that, as a default rule, "the responsibility to deliver gas at a pressure sufficient to allow the gas to enter [the receiving pipeline's] system rests with [the delivering pipeline]."  *Id.* P 23.  That rule can be overcome if it is "inconsistent" with either the receiving pipeline's tariff or the parties' contractual obligations.  *Id.*  Because neither circumstance was present, FERC ruled that "the responsibility to make changes to make deliveries possible will lie with Northern Natural, not ANR."  *Id.* P 25.

*Northern Natural*'s default rule should apply here.  There is no suggestion that shifting responsibility to Texas Eastern, the delivering pipeline, would be "inconsistent" with either pipeline's tariff.  *Id.*  Nor would it run counter to either party's contractual agreements.  *Id.*  Accordingly, *Northern Natural* directs that the "responsibility to make changes to make deliveries possible" lies with Texas Eastern, not with Columbia Gulf.  *Id.*

On rehearing, FERC responded that *Northern Natural* never set a default rule that requires delivering pipelines to deliver gas "at a minimum pressure that allows the receiving pipeline to accept it."  JA__ (Rehearing Order P 12).  FERC claims that *Northern Natural* simply looked to "whether the pipeline that was allegedly subject to an obligation to adjust its pressure"—in *Northern Natural*, the receiving pipeline; here, the delivering pipeline—was "in compliance with its contracts and tariff."  *Id.*

45

That is not what *Northern Natural* held.  It ruled that the *delivering pipeline*—and not the receiving pipeline—would need to make modifications "to its system to be able to fulfill customer commitments."  *Northern Natural*, 109 FERC ¶ 61,201, at P 25.  That framework does not turn on which party the "complaint was directed toward," as FERC now asserts.  JA__ (Rehearing Order P 12).  It turns on a default rule which gives delivering pipelines "the responsibility to deliver gas at a pressure sufficient to allow the gas to enter" the receiving pipeline's system.  *Northern Natural*, 109 FERC ¶ 61,201 at P 23.  Rather than expressly abandoning *Northern Natural*'s default rule or explaining why it does apply to these facts, FERC simply denies *Northern Natural*'s default rule ever existed—a textbook example of unreasonable decisionmaking.  *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 187 (D.C. Cir. 2022) (FERC's failure to recognize "changing positions" is unreasonable); *see also New England Power Generators Ass'n v. FERC,* 881 F.3d 202, 213 (D.C. Cir. 2018) ("FERC's failure to come to terms with its own precedent reflects the absence of a reasoned decisionmaking process.") (internal quotation marks and citation omitted); *Southwest Airlines*, 926 F.3d at 858 (if FERC departs from prior precedent, it must "acknowledge that it is doing so" (quoting *Louisiana Pub. Serv. Comm'n v. FERC*, 772 F.3d 1297, 1303 (D.C. Cir. 2014)).

Grasping, FERC's rehearing order asserted that *Northern Natural*'s default rule does not constitute past precedent because "Northern Natural's obligations were

not before the Commission" and because FERC "did not order Northern Natural to modify its system." JA__ (Rehearing Order P 13). Both explanations ring hollow. For starters, it does not matter whose obligations were technically before FERC, or which party made which arguments. This Court has before rejected FERC's argument that the precise question must have been "teed up" for a Commission holding to constitute past precedent, *Southwest Airlines*, 926 F.3d at 858, and has held that past precedent remains important "regardless of which party raise[d] the concern," *Kentucky Municipal Energy Agency v. FERC*, 45 F.4th 162, 178 (D.C. Cir. 2022). As this Court recently explained, the applicable legal standard need not be "directly at issue" for a prior case to create valuable precedent. *See Kentucky Mun.*, 45 F.4th at 178.

What matters is the *rationale* that FERC employed. *See New England Power*, 881 F.3d at 211 (remanding because "FERC failed to adequately explain why its rationale" from a prior case would not equally apply to the case before it); *see also Kentucky Mun.*, 45 F.4th at 178 (FERC "create[s] agency precedent" simply by "applying its understanding" of the relevant standard). And *Northern Natural*'s rationale was that the receiving pipeline did not have the responsibility to make modifications to account for pressure differentials because, by default, the "responsibility to make changes to make deliveries possible" lies with the *delivering*

*pipelines*, not receiving pipelines. *Northern Natural*, 109 FERC ¶ 61,201, at P 25. That rationale fully applies here.

Next, FERC *did* order the delivering pipeline to make system modifications in *Northern Natural*, insofar as such modifications were necessary to deliver gas. FERC stated it could not "verify that [the receiving pipeline's] increased operating pressure will in fact interfere with [the delivering pipeline's] capability to make scheduled deliveries." *Id.* But FERC was clear: *If* modifications were ultimately necessary "to deliver gas," the "responsibility to make" such modification lies with the delivering pipeline. *Id.* FERC did not order modifications because there were gaps in the record, not because there was any ambiguity about the delivering pipeline's responsibility to make the necessary modifications. *Northern Natural*'s rationale and holding point to the same default rule that delivering pipelines have the responsibility to make deliveries possible.

FERC's failure to come to terms with that rule is unreasonable. This Court should remand for FERC to adequately explain why it is abandoning Northern Natural's default rule or why that rule does not apply in this case.

**B.    FERC unreasonably departed from *Northern Natural*'s tariff interpretation.**

Separately, FERC may not depart from its prior interpretation of tariff language without providing a reasonable explanation for that departure. *See Idaho*

*Power Co.*, 312 F.3d at 461-462 (remanding for FERC's inconsistent interpretation of tariff language).  FERC's order fails that test, too.

In *Northern Natural*, the tariff of the receiving pipeline, ANR, stated that "Shipper shall cause the Gas to be delivered at the Receipt Point(s) at a pressure sufficient to allow the Gas to enter Transporter's existing pipeline system."  JA__ (Range Rehearing Request 36).  In an alternative ruling, *Northern Natural* held that this language applied to the delivering pipeline.  It ruled that the just-quoted tariff language "applies" and it requires gas from Northern Natural to "be delivered at a pressure sufficient to allow the gas to enter ANR's system."  *See Northern Natural*, 109 FERC ¶ 61,201, at P 23; *see also id.* P 14 (agreeing that "that receipts from Northern Natural" are "now governed" by "its tariff, which requires Northern Natural, the shipper, to deliver gas to ANR, the transporter" at sufficient pressures to enter the system).

Columbia Gulf's tariff has nearly identical language.  It states, "Shipper shall deliver gas or cause gas to be delivered to Transporter at the receipt points at a pressure sufficient to allow the gas to enter Transporter's pipeline as such pressure shall vary from time to time."  JA__ (Joint Complaint P 75 n.93).  But FERC refused to apply its previous interpretation of that language.  Without elaboration, it ruled that "shippers" would "not include Texas Eastern"—even though FERC previously interpreted the term "shipper" to include Northern Natural, another delivering

pipeline. *See Northern Natural*, 109 FERC ¶ 61,201, at PP 14, 23. Such opaque assertions do not pass arbitrary-and-capricious review. *See Sithe/Indep. Power Part., L.P. v. FERC*, 165 F.3d 944, 950 (D.C. Cir. 1999) (remanding because the Court was "unable to penetrate the logic of FERC's orders to ascertain whether FERC in fact departed from established policy and precedent and, if so, whether it justified that departure"); *see also Illinois Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 564 (D.C. Cir. 1997) (agency's "*ipse dixit* conclusion" was arbitrary and capricious).

Instead, on rehearing, FERC stated that *Northern Natural* did not construe "ANR's tariff to provide that Northern Natural was a 'Shipper.'" JA__ (Rehearing Order P 13 n.54). But again, Section 11.1 of the receiving pipeline's tariff used the term "shippers," and FERC applied that provision to a delivering pipeline. *Northern Natural*, 109 FERC ¶ 61,201, at P 14 (agreeing that Northern Natural, a delivering pipeline, was a "shipper" for these purposes). Thus, under any reading of *Northern Natural*, FERC *must have* construed the term "shipper" to encompass delivery pipelines like Texas Eastern.

Retreating further, FERC states that Columbia Gulf and Range do not contend on rehearing that Texas Eastern is a "shipper" of gas. JA__ (Rehearing Order P 13). That is wrong. Range's rehearing petition expressly argued that FERC failed to explain why ANR's "shipper" tariff language "properly applied to Northern Natural

(the upstream pipeline), but substantively identical tariff language does not apply to Texas Eastern (the upstream pipeline)."  JA__ (Range Rehearing Request 36). Range thus directly urged FERC to treat Texas Eastern as a "shipper," just as it had treated the delivering pipeline in its previous case.  *Id.*  This Court should vacate and remand for an adequate explanation.

## III.    FERC'S DECISION TO DENY A HEARING ON CONTESTED FACTUAL ISSUES WAS ARBITRARY AND CAPRICIOUS.

It is arbitrary and capricious for an agency to deny an evidentiary hearing when disputed issues of material fact cannot be resolved on the written record.  *Gen. Motors Corp. v. FERC*, 656 F.2d 791, 795-798 (D.C. Cir. 1981); *Pub. Svc. Co. of N.H. v. FERC*, 600 F.2d 944, 955-956 (D.C. Cir. 1979).  FERC failed that test when it denied hearings on whether Range is similarly situated to other firm shippers on the Texas Eastern system, and separately, on whether Texas Eastern properly declared a *force majeure* event during the 2021 Curtailment.

### A.    FERC was required to hold an evidentiary hearing to determine whether Range was similarly situated to other shippers on the Texas Eastern system.

Under 15 U.S.C. § 717c, FERC bears the front-line responsibility for enforcing its regulations, which include the prohibition against undue discrimination or preference.  18 C.F.R. §§ 284.7(a)(3), (b)(1) (2022); *see also Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, "Order No. 436," 50 FR 42408, 42424 (1985) (undue discrimination is "inconsistent with the fundamental

goals of consumer protection and competition in the Natural Gas Act and the Natural Gas Policy Act."). A prerequisite to a FERC undue-discrimination finding is an inquiry into whether similarly situated entities have been treated differently. *Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 549 (D.C Cir. 2010). FERC has described this inquiry as "intensely fact specific," one that "depends on the factual circumstances in each case." *Columbia Gas Transmission, LLC*, 165 FERC ¶ 61,042, at P 19 (2018). FERC has further explained that its complaint procedures are the appropriate forum for this determination, including, in part, because such procedures provide the opportunity for investigation of the relevant facts. *Id.*, at P 21.

Range alleged that it received lower priority firm service compared to other firm shippers with geographically proximate delivery points on Texas Eastern's system. JA__-__ (Joint Complaint PP 69, 70); JA__, __ (Range Complaint PP 35, 39). Range properly proffered evidence, JA__ (Joint Complaint P 60); JA__ (Texas Eastern Meter and Compressor Readings During Adair Zero Flows, Joint Complaint Ex. 11), that raised the question of whether Range, which received 0 percent of its nominated firm quantities, was similarly situated to these firm shippers who received 80 percent of their nominated firm quantities during the 2021 Curtailment. But rather than submit that factual question for an evidentiary hearing, FERC declared that the differences between meters and pipeline interconnections were "obvious"

and that "Complainants have not shown that the circumstances at a meter on Texas Eastern's system would be sufficiently similar to those occurring at an interconnection."  JA__ (Rehearing Order P 15).  FERC's declaration is arbitrary and capricious because it offers no reasoned basis for requiring Range to provide—without the benefit of an evidentiary hearing and the discovery process that goes along with it—facts about operational circumstances on Texas Eastern's pipeline that were solely within Texas Eastern's possession.

FERC also failed to provide a reasoned basis for distinguishing *El Paso Natural Gas Co.*, 99  FERC ¶ 61,244 (2002).  In its Rehearing Order, FERC stated that Range's nominations were reduced not because Texas Eastern could not schedule them but because Columbia Gulf would not receive them at Texas Eastern's prevailing line pressures.  JA__ (Rehearing Order P 15).  But *El Paso* stands for the much broader proposition that a firm shipper must be able to reliably schedule its firm contractual entitlements without service interruptions.  *El Paso*, 99 FERC at ¶ 62,001; *contra.* JA__ (Rehearing Order P 15 n.63).  FERC failed to explain why Texas Eastern's prevailing line pressures, rather than Range's right to reliably schedule its firm contractual entitlements without service reductions, governed whether the complaints should be set for evidentiary hearing.  The Court should remand to ensure that FERC does not "gloss[ ] over or swerve from prior precedents," but instead acknowledges change "and provide[s] a reasoned

explanation for it." *S. Cal. Edison Co. v. FERC*, 717 F.3d 177, 183 (D.C. Cir. 2013) (citing *W & M Props. of Conn., Inc. v. NLRB*, 514 F. 3d 1341, 1347 (D.C. Cir. 2008)).

FERC also failed to address Range's allegations that Texas Eastern reduced the pressure on Line 25, when PHMSA did not require it, for its own operational purposes. JA__ (Joint Complaint P 66); JA__ (Range Complaint P 34). This raised the disputed factual issue of whether Texas Eastern's operational decisions allowed for Texas Eastern to continue to provide service to other firm shippers, while inhibiting Range's ability to receive its contracted for firm service. These facts fit squarely within *El Paso*'s holding, but FERC did not provide a reasoned explanation for why *El Paso* was distinguishable or should be abandoned, as this Court requires. *E.g.*, *S. Cal. Edison Co.*, 717 F.3d at 183.

### B.    FERC was required to hold an evidentiary hearing to determine whether a *force majeure* event occurred.

Range's complaint and evidence also raised the disputed factual issue of whether Texas Eastern was permitted to declare a *force majeure* event under Section 17.1 of its Tariff during the 2021 Curtailment. Here too, FERC's failure to direct an evidentiary hearing was arbitrary and capricious.

Range and Columbia Gulf cited various PHMSA directives that called into question the legitimacy of Texas Eastern's reliance on PHMSA action to declare a *force majeure* event during the 2021 Curtailment. *E.g.,* JA__-__ (Joint Complaint

PP 30-33) (citing PHMSA Notice, Joint Complaint Ex. 1; Corrective Action Order, Joint Complaint Ex. 7; and Amended Corrective Action Order, Joint Complaint Ex. 8)).  FERC's dismissive mischaracterization of these directives and the associated discussion as "not relevant" and "attributing motives or explanations to Texas Eastern without any evidentiary support," JA__ (Order P 65), is wholly incorrect, as the directives provide the very support FERC claims to be lacking.

It simply does not follow that FERC could find, by implication, that the singular basis for Texas Eastern declaring a *force majeure* event was a May 28, 2021 PHMSA directive, but then not be willing to accept—let alone consider—every other PHMSA directive cited by Range that demonstrates that Texas Eastern should not have been able to rely on any PHMSA directive to declare *force majeure* for all of its operations on the 30-inch system during the 2021 Curtailment.  FERC's failure to engage in a substantive discussion on this point was arbitrary and capricious.  *See, e.g.*, *Cajun Elec. Power Coop., Inc. v. FERC*, 28 F.3d 173, 180 (D.C. Cir. 1994) (concluding FERC erred by ignoring an important question of fact and failing to conduct evidentiary hearings).

FERC also failed to reconcile the contradictory statements made by Texas Eastern's employee, Berk Donaldson.  Range's rehearing request highlighted that FERC relied on the Donaldson Affidavit's assertion that Range's nominations were not scheduled during the 2021 Curtailment "as a result of a *force majeure* event,"

even though the next paragraph of the same affidavit contradicted this statement by claiming that the failure to nominate "[w]as a result of Columbia Gulf's refusal to receive gas," which does not constitute a *force majeure* event. JA__-__ (Range Rehearing Request 28-30). In the Rehearing Order, FERC did not analyze this discrepancy and instead accepted Texas Eastern's contradictory logic as fact. JA__ (Rehearing Order P 16 n.71).

Finally, FERC's response that "Range has already been provided reservation charge credits" critically misses the point. JA__ (Rehearing Order P 16). Resolution of whether Texas Eastern properly declared *force majeure* on its 30-inch system goes to the heart of whether Texas Eastern breached its obligation to Range and/or committed any actionable violations. The cause of Range's service interruptions dictates which provision of Texas Eastern's tariff applies, which in turn impacts the amount of reservation charge adjustments that apply. As pled in the complaints: If Texas Eastern failed to deliver Range's nominations due to a non-*force majeure* event that was within Texas Eastern's control, then Section 31.1 of Texas Eastern's tariff applies and full reservation charge adjustments would have been given. JA__ (Range Rehearing Request 29). But if Range's nominations were not delivered because of a *force majeure* event or because Columbia Gulf refused to confirm

nominations, then other reservation charge adjustment provisions of Texas Eastern's tariff apply. *Id.* (citing Sections 31.2 and 31.3 of Texas Eastern's tariff).[6]

In particular, following non-*force majeure* events, reservation charge credits are paid from the first day of Texas Eastern's inability to deliver nominated volumes to primary points. JA__ (Joint Complaint P 58). In contrast, for *force majeure* outages, credits are not given until at least 10 days have passed, and those credits are based on different measurements depending on whether notice has been provided or not. The fact that Texas Eastern had already "provided" Range with reservation charge credits does not answer the question of whether Range received all credits it would have been owed or whether Texas Eastern properly invoked its *force majeure* tariff rights. *Contra* JA __ (Donaldson Affidavit, Motion to Dismiss Joint Complaint P 8). These are material disputed facts, and FERC acted unreasonably in denying an evidentiary hearing on whether Texas Eastern properly declared a *force majeure* event during the 2021 Curtailment.

---

[6] Section 31.2 provides for a 10-day safe harbor if a *force majeure* event results in Texas Eastern failing to provide service, whereby no reservation charge adjustments are made until the 11th day of the outage. Section 31.3(iii) provides that no reservation charge adjustments are owed where the failure to deliver is due to the conduct of the downstream operator of the facilities at the applicable delivery point, as long as the conduct was outside the control of Texas Eastern.

## CONCLUSION

For the foregoing reasons, the petitions for review should be granted.

Respectfully submitted,

Sean Marotta
Matthew J. Higgins
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
matthew.higgins@hoganlovells.com
(202) 637-5889

Dave Hammel
TC ENERGY CORPORATION
700 Louisiana Street, Suite 700
Houston, TX 77002

*Counsel for Columbia Gulf
Transmission, LLC*

December 29, 2022

*/s/ John Paul Floom*
John Paul Floom
Kaci W. Poor
FLOOM ENERGY LAW PLLC
3100 Clarendon Blvd., Suite 920
Arlington, VA 22201
jpf@floomenergylaw.com
(571) 842-8185
kwp@floomenergylaw.com
(571) 842-8189

*Counsel for Range Resources –
Appalachia, LLC*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit set by this Court's briefing order because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,968 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

*/s/ John Paul Floom*
John Paul Floom
FLOOM ENERGY LAW PLLC
3100 Clarendon Blvd., Suite 920
Arlington, VA 22201
jpf@floomenergylaw.com
(571) 842-8185

## CERTIFICATE OF SERVICE

I certify that on December 29, 2022, the foregoing brief was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ John Paul Floom*
John Paul Floom
FLOOM ENERGY LAW PLLC
3100 Clarendon Blvd., Suite 920
Arlington, VA 22201
jpf@floomenergylaw.com
(571) 842-8185

60

# ADDENDUM

## TABLE OF CONTENTS

| Description | Page |
|---|---|
| 15 U.S.C. § 717c | ADD-1 |
| 15 U.S.C. § 717r | ADD-2 |
| 18 C.F.R. § 284.7 | ADD-3 |
| 18 C.F.R. § 385.206 | ADD-3 |

# §717c. Rates and charges

**(a) Just and reasonable rates and charges**

All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

**(b) Undue preferences and unreasonable rates and charges prohibited**

No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Filing of rates and charges with Commission; public inspection of schedules**

Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time (not less than sixty days from June 21, 1938) and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Changes in rates and charges; notice to Commission**

Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Authority of Commission to hold hearings concerning new schedule of rates**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission, or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Storage services**

(1) In exercising its authority under this chapter or the Natural Gas Policy Act of 1978 (15 U.S.C. 3301 et seq.), the Commission may authorize a natural gas company (or any person that will be a natural gas company on completion of any proposed construction) to provide storage and storage-related services at market-based rates for new storage capacity related to a specific facility placed in service after August 8, 2005, notwithstanding the fact that the company is unable to demonstrate that the company lacks market power, if the Commission determines that-

    (A) market-based rates are in the public interest and necessary to encourage the construction of the storage capacity in the area needing storage services; and

    (B) customers are adequately protected.

(2) The Commission shall ensure that reasonable terms and conditions are in place to protect consumers.

(3) If the Commission authorizes a natural gas company to charge market-based rates under this subsection, the Commission shall review periodically whether the market-based rate is just, reasonable, and not unduly discriminatory or preferential.

(June 21, 1938, ch. 556, §4, 52 Stat. 822 ; Pub. L. 87–454, May 21, 1962, 76 Stat. 72 ; Pub. L. 109–58, title III, §312, Aug. 8, 2005, 119 Stat. 688 .)

### Editorial Notes

### References in Text

The Natural Gas Policy Act of 1978, referred to in subsec. (f)(1), is Pub. L. 95–621, Nov. 9, 1978, 92 Stat. 3350 , as amended, which is classified generally to chapter 60 (§3301 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 3301 of this title and Tables.

### Amendments

**2005**-Subsec. (f). Pub. L. 109–58 added subsec. (f).

**1962**-Subsec. (e). Pub. L. 87–454 inserted "or gas distributing company" after "State commission", and struck out proviso which denied authority to the Commission to suspend the rate, charge, classification, or service for the sale of natural gas for resale for industrial use only.

### Statutory Notes and Related Subsidiaries

### Advance Recovery of Expenses Incurred by Natural Gas Companies for Natural Gas Research, Development, and Demonstration Projects

Pub. L. 102–104, title III, Aug. 17, 1991, 105 Stat. 531 , authorized Federal Energy Regulatory Commission, pursuant to this section, to allow recovery, in advance, of expenses by natural-gas companies for research, development and demonstration activities by Gas Research Institute for projects on use of natural gas in motor vehicles and on use of natural gas to control emissions from combustion of other fuels, subject to Commission finding that benefits, including environmental benefits, to both existing and future ratepayers resulting from such activities exceed all direct costs to both existing and future ratepayers, prior to repeal by Pub. L. 102–486, title IV, §408(c), Oct. 24, 1992, 106 Stat. 2882 .

# §717r. Rehearing and review

**(a) Application for rehearing; time**

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) Review of Commission order**

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**(d) Judicial review**

   **(1) In general**

   The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

   **(2) Agency delay**

   The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction

over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission)

or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

**(3) Court action**

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

(June 21, 1938, ch. 556, §19, 52 Stat. 831 ; June 25, 1948, ch. 646, §32(a), 62 Stat. 991 ; May 24, 1949, ch. 139, §127, 63 Stat. 107 ; Pub. L. 85–791, §19, Aug. 28, 1958, 72 Stat. 947 ; Pub. L. 109–58, title III, §313(b), Aug. 8, 2005, 119 Stat. 689 .)

EDITORIAL NOTES

### REFERENCES IN TEXT

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), (2), is title III of Pub. L. 89–454, as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280 , which is classified generally to chapter 33 (§1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

### CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended [28 U.S.C. 346, 347]" on authority of act June 25, 1948, ch. 646, 62 Stat. 869 , the first section of which enacted Title 28, Judiciary and Judicial Procedure.

### AMENDMENTS

**2005**-Subsec. (d). Pub. L. 109–58 added subsec. (d).

**1958**-Subsec. (a). Pub. L. 85–791, §19(a), inserted sentence providing that until record in a proceeding has been filed in a court of appeals, Commission may modify or set aside any finding or order issued by it.

Subsec. (b). Pub. L. 85–791, §19(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and, in third sentence, substituted "petition" for "transcript", and "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

STATUTORY NOTES AND RELATED SUBSIDIARIES

### CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals" wherever appearing.

transportation authorized by section 311(a) of the NGPA.

[44 FR 52184, Sept. 7, 1979, as amended by Order 581, 60 FR 53072, Oct. 11, 1995]

### § 284.4   Reporting.

(a) *Reports in MMBtu.* All reports filed pursuant to this part must indicate quantities of natural gas in MMBtu's. An MMBtu means a million British thermal units. A British thermal unit or Btu means the quantity of heat required to raise the temperature of one pound avoirdupois of pure water from 58.5 degrees to 59.5 degrees Fahrenheit, determined in accordance with paragraphs (b) and (c) of this section.

(b) *Measurement.* The Btu content of one cubic foot of natural gas under the standard conditions specified in paragraph (c) of this section is the number of Btu's produced by the complete combustion of such cubic foot of gas, at constant pressure with air of the same temperature and pressure as the gas, when the products of combustion are cooled to the initial temperature of the gas and air and when the water formed by such combustion is condensed to a liquid state.

(c) *Standard conditions.* The standard conditions for purposes of paragraph (b) of this section are as follows: The gas is saturated with water vapor at 60 degrees Fahrenheit under a pressure equivalent to that of 30.00 inches of mercury at 32 degrees Fahrenheit, under standard gravitational force (980.665 centimeters per second squared).

[Order 581, 60 FR 53072, Oct. 11, 1995]

### § 284.5   Further terms and conditions.

The Commission may prospectively, by rule or order, impose such further terms and conditions as it deems appropriate on transactions authorized by this part.

### § 284.6   Rate interpretations.

(a) *Procedure.* A pipeline may obtain an interpretation pursuant to subpart L of part 385 of this chapter concerning whether particular rates and charges comply with the requirements of this part.

(b) *Address.* Requests for interpretations should be addressed to: FERC

Part 284 Interpretations, Office of General Counsel, Federal Energy Regulatory Commission, Washington, DC 20426.

[44 FR 66791, Nov. 21, 1979; 44 FR 75383, Dec. 20, 1979, as amended by Order 225, 47 FR 19058, May 3, 1982; Order 581, 60 FR 53072, Oct. 11, 1995]

### § 284.7   Firm transportation service.

(a) *Firm transportation availability.* (1) An interstate pipeline that provides transportation service under subpart B or G of this part must offer such transportation service on a firm basis and separately from any sales service.

(2) An intrastate pipeline that provides transportation service under Subpart C may offer such transportation service on a firm basis.

(3) *Service on a firm basis* means that the service is not subject to a prior claim by another customer or another class of service and receives the same priority as any other class of firm service.

(4) An interstate pipeline that provided a firm sales service on May 18, 1992, and that offers transportation service on a firm basis under subpart B or G of this part, must offer a firm transportation service under which firm shippers may receive delivery up to their firm entitlements on a daily basis without penalty.

(b) *Non-discriminatory access.* (1) An interstate pipeline or intrastate pipeline that offers transportation service on a firm basis under subpart B, C or G must provide such service without undue discrimination, or preference, including undue discrimination or preference in the quality of service provided, the duration of service, the categories, prices, or volumes of natural gas to be transported, customer classification, or undue discrimination or preference of any kind.

(2) An interstate pipeline that offers transportation service on a firm basis under subpart B or G of this part must provide each service on a basis that is equal in quality for all gas supplies transported under that service, whether purchased from the pipeline or another seller.

(3) An interstate pipeline that offers transportation service on a firm basis under subpart B or G of this part may

834

**Federal Energy Regulatory Commission**                    **§ 284.8**

not include in its tariff any provision that inhibits the development of market centers.

(c) *Reasonable operational conditions.* Consistent with paragraph (b) of this section, a pipeline may impose reasonable operational conditions on any service provided under this part. Such conditions must be filed by the pipeline as part of its transportation tariff.

(d) *Segmentation.* An interstate pipeline that offers transportation service under subpart B or G of this part must permit a shipper to make use of the firm capacity for which it has contracted by segmenting that capacity into separate parts for its own use or for the purpose of releasing that capacity to replacement shippers to the extent such segmentation is operationally feasible.

(e) *Reservation fee.* Where the customer purchases firm service, a pipeline may impose a reservation fee or charge on a shipper as a condition for providing such service. Except for pipelines subject to subpart C of this part, if a reservation fee is charged, it must recover all fixed costs attributable to the firm transportation service, unless the Commission permits the pipeline to recover some of the fixed costs in the volumetric portion of a two-part rate. A reservation fee may not recover any variable costs or fixed costs not attributable to the firm transportation service. Except as provided in this paragraph, the pipeline may not include in a rate for any transportation provided under subpart B, C or G of this part any minimum bill or minimum take provision, or any other provision that has the effect of guaranteeing revenue.

(f) *Limitation.* A person providing service under Subpart B, C or G of this part is not required to provide any requested transportation service for which capacity is not available or that would require the construction or acquisition of any new facilities.

[Order 436, 50 FR 42493, Oct. 18, 1985]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting § 284.7, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov.*

**§ 284.8  Release of firm capacity on interstate pipelines.**

(a) An interstate pipeline that offers transportation service on a firm basis under subpart B or G of this part must include in its tariff a mechanism for firm shippers to release firm capacity to the pipeline for resale by the pipeline on a firm basis under this section.

(b)(1) Firm shippers must be permitted to release their capacity, in whole or in part, on a permanent or short-term basis, without restriction on the terms or conditions of the release. A firm shipper may arrange for a replacement shipper to obtain its released capacity from the pipeline. A replacement shipper is any shipper that obtains released capacity.

(2) The rate charged the replacement shipper for a release of capacity may not exceed the applicable maximum rate, except that no rate limitation applies to the release of capacity for a period of one year or less if the release is to take effect on or before one year from the date on which the pipeline is notified of the release. Payments or other consideration exchanged between the releasing and replacement shippers in a release to an asset manager as defined in paragraph (h)(3) of this section are not subject to the maximum rate.

(c) Except as provided in paragraph (h) of this section, a firm shipper that wants to release any or all of its firm capacity must notify the pipeline of the terms and conditions under which the shipper will release its capacity. The firm shipper must also notify the pipeline of any replacement shipper designated to obtain the released capacity under the terms and conditions specified by the firm shipper.

(d) The pipeline must provide notice of offers to release or to purchase capacity, the terms and conditions of such offers, and the name of any replacement shipper designated in paragraph (b) of this section, on an Internet web site, for a reasonable period.

(e) The pipeline must allocate released capacity to the person offering the highest rate and offering to meet any other terms and conditions of the release. If more than one person offers the highest rate and meets the terms and conditions of the release, the released capacity may be allocated on a

835

each tariff or rate filing must include, as appropriate:

(1) If known, the reference numbers, docket numbers, or other identifying symbols of any relevant tariff, rate, schedule, contract, application, rule, or similar matter or material;

(2) The name of each participant for whom the filing is made or, if the filing is made for a group of participants, the name of the group, provided that the name of each member of the group is set forth in a previously filed document which is identified in the filing being made;

(3) The specific authorization or relief sought;

(4) The tariff or rate sheets or sections;

(5) The name and address of each person against whom the complaint is directed;

(6) The relevant facts, if not set forth in a previously filed document which is identified in the filing being made;

(7) The position taken by the participant filing any pleading, to the extent known when the pleading is filed, and the basis in fact and law for such position;

(8) Subscription or verification, if required;

(9) A certificate of service under Rule 2010(h), if service is required;

(10) The name, address, and telephone number of an individual who, with respect to any matter contained in the filing, represents the person for whom filing is made; and

(11) Any additional information required to be included by statute, rule, or order.

(b) *Requirement for any initial pleading or tariff or rate filing.* The initial pleading or tariff or rate filing submitted by a participant or a person seeking to become a party must conform to the requirements of paragraph (a) of this section and must include:

(1) The exact name of the person for whom the filing is made;

(2) The location of that person's principal place of business; and

(3) The name, address, and telephone number of at least one, but not more than two, persons upon whom service is to be made and to whom communications are to be addressed in the proceeding.

(c) *Combined filings.* If two or more pleadings, or one or more pleadings and a tariff or rate filing are included as items in a single filing each such item must be separately designated and must conform to the requirements which would be applicable to it if filed separately.

(d) *Form of notice.* If a pleading or tariff or rate filing must include a form of notice suitable for publication in the FEDERAL REGISTER, the company shall submit the draft notice in accordance with the form of notice specifications prescribed by the Secretary and posted under the Filing Procedures link at *http://www.ferc.gov* and available in the Commission's Public Reference Room.

[Order 225, 47 FR 19022, May 3, 1982, as amended by Order 647, 69 FR 32439, June 10, 2004; Order 663, 70 FR 55725, Sept. 23, 2005; 71 FR 14642, Mar. 23, 2006; Order 714, 73 FR 57538, Oct. 3, 2008]

§ 385.204  **Applications (Rule 204).**

Any person seeking a license, permit, certification, or similar authorization or permission, must file an application to obtain that authorization or permission.

§ 385.205  **Tariff or rate filings (Rule 205).**

(a) A person must make a tariff or rate filing in order to establish or change any specific rate, rate schedule, tariff, tariff schedule, fare, charge, or term or condition of service, or any classification, contract, practice, or any related regulation established by and for the applicant.

(b) A tariff or rate filing must be made electronically in accordance with the requirements and formats for electronic filing listed in the instructions for electronic filings. A tariff or rate filing not made in accordance with these requirements and formats will not have a statutory action date and will not become effective should the Commission not act by the requested action date.

[Order 714–A, 79 FR 29077, May 21, 2014]

§ 385.206  **Complaints (Rule 206).**

(a) *General rule.* Any person may file a complaint seeking Commission action against any other person alleged to be in contravention or violation of

**Federal Energy Regulatory Commission**                    **§ 385.206**

any statute, rule, order, or other law administered by the Commission, or for any other alleged wrong over which the Commission may have jurisdiction.

(b) *Contents.* A complaint must:

(1) Clearly identify the action or inaction which is alleged to violate applicable statutory standards or regulatory requirements;

(2) Explain how the action or inaction violates applicable statutory standards or regulatory requirements;

(3) Set forth the business, commercial, economic or other issues presented by the action or inaction as such relate to or affect the complainant;

(4) Make a good faith effort to quantify the financial impact or burden (if any) created for the complainant as a result of the action or inaction;

(5) Indicate the practical, operational, or other nonfinancial impacts imposed as a result of the action or inaction, including, where applicable, the environmental, safety or reliability impacts of the action or inaction;

(6) State whether the issues presented are pending in an existing Commission proceeding or a proceeding in any other forum in which the complainant is a party, and if so, provide an explanation why timely resolution cannot be achieved in that forum;

(7) State the specific relief or remedy requested, including any request for stay or extension of time, and the basis for that relief;

(8) Include all documents that support the facts in the complaint in possession of, or otherwise attainable by, the complainant, including, but not limited to, contracts and affidavits;

(9) State

(i) Whether the Enforcement Hotline, Dispute Resolution Service, tariff-based dispute resolution mechanisms, or other informal dispute resolution procedures were used, or why these procedures were not used;

(ii) Whether the complainant believes that alternative dispute resolution (ADR) under the Commission's supervision could successfully resolve the complaint;

(iii) What types of ADR procedures could be used; and

(iv) Any process that has been agreed on for resolving the complaint.

(10) Include a form of notice of the complaint suitable for publication in the FEDERAL REGISTER in accordance with the specifications in § 385.203(d) of this part. The form of notice shall be on electronic media as specified by the Secretary.

(11) Explain with respect to requests for Fast Track processing pursuant to section 385.206(h), why the standard processes will not be adequate for expeditiously resolving the complaint.

(c) *Service.* Any person filing a complaint must serve a copy of the complaint on the respondent, affected regulatory agencies, and others the complainant reasonably knows may be expected to be affected by the complaint. Service must be simultaneous with filing at the Commission for respondents. Simultaneous or overnight service is permissible for other affected entities. Simultaneous service can be accomplished by electronic mail in accordance with § 385.2010(f)(3), facsimile, express delivery, or messenger.

(d) *Notice.* Public notice of the complaint will be issued by the Commission.

(e) [Reserved]

(f) *Answers, interventions and comments.* Unless otherwise ordered by the Commission, answers, interventions, and comments to a complaint must be filed within 20 days after the complaint is filed. In cases where the complainant requests privileged treatment for information in its complaint, answers, interventions, and comments are due within 30 days after the complaint is filed. In the event there is an objection to the protective agreement, the Commission will establish when answers will be due.

(g) *Complaint resolution paths.* One of the following procedures may be used to resolve complaints:

(1) The Commission may assign a case to be resolved through alternative dispute resolution procedures in accordance with §§ 385.604–385.606, in cases where the affected parties consent, or the Commission may order the appointment of a settlement judge in accordance with § 385.603;

(2) The Commission may issue an order on the merits based upon the pleadings;

1175

(3) The Commission may establish a hearing before an ALJ;

(h) *Fast Track processing.* (1) The Commission may resolve complaints using Fast Track procedures if the complaint requires expeditious resolution. Fast Track procedures may include expedited action on the pleadings by the Commission, expedited hearing before an ALJ, or expedited action on requests for stay, extension of time, or other relief by the Commission or an ALJ.

(2) A complainant may request Fast Track processing of a complaint by including such a request in its complaint, captioning the complaint in bold type face "COMPLAINT REQUESTING FAST TRACK PROCESSING," and explaining why expedition is necessary as required by section 385.206(b)(11).

(3) Based on an assessment of the need for expedition, the period for filing answers, interventions and comments to a complaint requesting Fast Track processing may be shortened by the Commission from the time provided in section 385.206(f).

(4) After the answer is filed, the Commission will issue promptly an order specifying the procedure and any schedule to be followed.

(i) *Simplified procedure for small controversies.* A simplified procedure for complaints involving small controversies is found in section 385.218 of this subpart.

(j) *Satisfaction.* (1) If the respondent to a complaint satisfies such complaint, in whole or in part, either before or after an answer is filed, the complainant and the respondent must sign and file:

(i) A statement setting forth when and how the complaint was satisfied; and

(ii) A motion for dismissal of, or an amendment to, the complaint based on the satisfaction.

(2) The decisional authority may order the submission of additional information before acting on a motion for dismissal or an amendment under paragraph (c)(1)(ii) of this section.

[Order 225, 47 FR 19022, May 3, 1982, as amended by Order 602, 64 FR 17097, Apr. 8, 1999; Order 602–A, 64 FR 43608, Aug. 11, 1999; Order 647, 69 FR 32440, June 10, 2004; Order 769, 77 FR 65476, Oct. 29, 2012]

## § 385.207   Petitions (Rule 207).

(a) *General rule.* A person must file a petition when seeking:

(1) Relief under subpart I, J, or K of this part;

(2) A declaratory order or rule to terminate a controversy or remove uncertainty;

(3) Action on appeal from a staff action, other than a decision or ruling of a presiding officer, under Rule 1902;

(4) A rule of general applicability; or

(5) Any other action which is in the discretion of the Commission and for which this chapter prescribes no other form of pleading.

(b) *Declarations of intent under the Federal Power Act.* For purposes of this part, a declaration of intent under section 23(b) of the Federal Power Act is treated as a petition for a declaratory order.

(c) Except as provided in § 381.302(b), each petition for issuance of a declaratory order must be accompanied by the fee prescribed in § 381.302(a).

[Order 225, 47 FR 19022, May 3, 1982, as amended by Order 395, 49 FR 35357, Sept. 7, 1984]

## § 385.208   [Reserved]

## § 385.209   Notices of tariff or rate examination and orders to show cause (Rule 209).

(a) *Issuance.* (1) If the Commission seeks to determine the validity of any rate, rate schedule, tariff, tariff schedule, fare, charge, or term or condition of service, or any classification, contract, practice, or any related regulation established by and for the applicant which is demanded, observed, charged, or collected, the Commission will initiate a proceeding by issuing a notice of tariff or rate examination.

(2) The Commission may initiate a proceeding against a person by issuing an order to show cause.

(b) *Contents.* A notice of examination or an order to show cause will contain a statement of the matters about which the Commission is inquiring, and a statement of the authority under which the Commission is acting. The statement is tentative and sets forth issues to be considered by the Commission.

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

RANGE RESOURCES-APPALACHIA, LLC,  )
 and           )
COLUMBIA GULF TRANSMISSION, LLC, )
 Petitioners,        )
             )
    v.       ) Nos. 22-1151
             )    22-1252
FEDERAL ENERGY REGULATORY COMMISSION, )  22-1202
 Respondent,       )    22-1203
 and           )
TEXAS EASTERN TRANSMISSION, LP,  )
 Intervenor for Respondent.   )

**AFFIDAVIT OF EDGAR TRILLO**

Edgar Trillo affirms under the penalty of perjury:

1. I, Edgar Trillo, am the Director of Nominations and Scheduling of TransCanada USA Services Inc., which is an indirect subsidiary of TC Energy Corporation ("TC Energy"). As Director of Nominations and Scheduling, I am responsible for the daily administration of TC Energy's US Natural Gas Pipelines including Columbia Gulf Transmission, LLC ("Columbia Gulf"). I have been involved with Columbia Gulf's response to the persistent and ongoing operational issues at the interconnection between Columbia Gulf and Texas Eastern Transmission, LP, ("Texas Eastern") in Adair County, Kentucky ("Adair Interconnect").

1

DocuSign Envelope ID: DBECB508-327C-4A91-8B8F-77D0CBDC48BB

2.     Texas Eastern's interstate pipeline system interconnects with Lines 200 and 300 of Columbia Gulf's interstate pipeline system at the Adair Interconnect. Texas Eastern and natural gas producer Range Resources – Appalachia, LLC ("Range") entered into a 2017 service agreement, which provides for Texas Eastern to transport 200,000 Dekatherms/day (dth/d) of natural gas per day for delivery into Columbia Gulf's pipeline at the Adair Interconnect.

3.     Columbia Gulf receives these volumes at the Adair Interconnect and transports them on its system.  At an interconnection such as this, the laws of physics dictate that gas can only flow from the system with the higher prevailing line pressure to the system with the lower one.  In short, Texas Eastern's prevailing line pressure must be equal to or greater than Columbia Gulf's in order for volumes to be received.  Since deliveries began in 2017, Texas Eastern has consistently failed to deliver gas at the operating pressures necessary to meet Columbia Gulf's maximum allowable operating pressure ("MAOP"), or the prevailing operating pressures on Columbia Gulf's system at particular times.

4.     Columbia Gulf's system at the Adair Interconnect has a MAOP of 1,007 pounds per square inch gauge ("psig") and a typical prevailing pressure ranging from 650 to 850 psig.  Texas Eastern's line pressures are inconsistent and often fail to meet Columbia Gulf's prevailing line pressure at the Adair Interconnect, which prohibits deliveries. Texas Eastern has been unwilling or unable to increase

DocuSign Envelope ID: DBECB508-327C-4A91-8B8F-77D0CBDC48BB

the pressure, despite Columbia Gulf's repeated demands and extensive communications.

5.    These pressure differentials directly caused service curtailments from November 5, 2019 through November 11, 2019 and from May 2021 through July 2021, where Range was unable to flow its full firm transportation service volumes from Texas Eastern through the Adair Interconnect into the Columbia Gulf system. These disruptions were substantial.  For 23 days during the 2021 Curtailment, Range was unable to transport any gas from the Adair Interconnect at all.

6.    Those curtailments directly caused significant operational, administrative, and financial harms for Columbia Gulf.  From an operational perspective, to resolve the curtailments and draw down the imbalance, Columbia Gulf was forced to take excess gas from other interconnected pipelines and to utilize third-party gas storage.  Making these operational changes requires near-constant communication with customers and other pipelines.  Operating Columbia Gulf's system in this way is burdensome and unpredictable.

7.    Administratively, as the imbalance grows out of tolerance, Columbia Gulf is left with no option but to issue a customer underperformance advisory posting to inform customers of the underperformance and potential need to reduce scheduled volumes to match flow and address the imbalance.  If the imbalance persists, Columbia Gulf posts the curtailment to customers and begins reducing

3

DocuSign Envelope ID: DBECB508-327C-4A91-8B8F-77D0CBDC48BB

nominations to match flow until the issue is resolved. Establishing the level to curtail to is always a guessing game given the unpredictability of Texas Eastern's performance. Columbia Gulf tries to determine the proper level to restrict to based on Texas Eastern's historical performance; however, the performance is inconsistent.

8.    Financially, curtailments in service cause customers to short-pay their invoices, which in turn, forces Columbia Gulf to deal with assessing late charges and burdens it with the collection of unpaid amounts. As just one example, Range Resources, the customer primarily impacted currently has close to $1.5 million in unpaid invoices to Columbia Gulf for its inability to use the capacity during the curtailments.

9.    If Texas Eastern continues to be unable meet or exceed Columbia Gulf's prevailing line pressure, the gas physically cannot flow at the interconnect, which will imminently and inevitably cause future disruptions to flow and more curtailments. As shown in the graphic below, the Adair Interconnect is located between Texas Eastern's Danville Compressor Station and Tompkinsville Compressor Station in Texas Eastern's Market Zone 2. Located between these compressor stations on Texas Eastern's system are two additional gas delivery points, "Liberty" and "KY Energy." The Adair Interconnect feeds gas into Columbia Gulf's 30-Inch Mainline 200 (ML200) and 36-inch Mainline 300

4

(ML300) at a point located between Columbia Gulf's Clementsville Compressor Station and Goodluck Compressor Station.  This interconnect is approximately 12 miles south of the Clementsville Compressor Station discharge.  Columbia Gulf's full firm contractual obligations in the Southbound direction require Clementsville compressor station to be compressing gas up to the 1,007 psig MAOP on the discharge.



10.    To mitigate the risk of future curtailments, Columbia Gulf has taken a number of actions.  Most significantly, Columbia Gulf has isolated a section of ML200 on its pipeline to act as a low-pressure receiver of Texas Eastern's gas and

DocuSign Envelope ID: DBECB508-327C-4A91-8B8F-77D0CBDC48BB

to raise the gas pressure to meet Columbia Gulf's prevailing line pressures using Clementsville Compressor Station in a mode that is only available when the system is flowing at a rate less than the full contractual obligations. Isolating this section results in utilizing approximately 12 miles of pipeline in the Northbound direction that is contractually required to flow in the Southbound direction. A gas controller is responsible for continuously monitoring actual flows versus the full contractual obligations and pressure differentials between the two systems to determine whether or not this Clementsville mode of isolating ML200 can be used at any given time. If the gas controller deems conditions are acceptable for this mode, then the controller will remotely close the ML200 valve to enable this mode. Remotely closing or opening the ML200 valve requires the gas controller to manually flip a switch. Continuously monitoring these gas flows and manually flipping the valve switch significantly adds to the gas controller's day-to-day responsibilities and burdens.

11.    Operating in this abnormal mode of isolating a section of ML200 causes an increased load on the Clementsville Compressor Station due to the need to pump the gas from the Adair Interconnect. This increased load causes additional hours of run time for the compressor units, which results in an increase in maintenance capital. Specifically, this leads to more frequent service intervals, additional work hours for operations personnel, and results in more fuel needed to run the system.

DocuSign Envelope ID: DBECB508-327C-4A91-8B8F-77D0CBDC48BB

Columbia Gulf's fuel usage is tracked and the pipeline customers reimburse the pipeline for fuel used; therefore the increased fuel usage results in higher transportation costs for all of Columbia Gulf's customers.

12.     The ability to isolate ML200 is only possible if/when Columbia Gulf's total southbound requirements for a given day are significantly below the system's designed level.  This can occur in a couple different ways, but primarily when: a) Columbia Gulf's customers are opting to utilize their capacity at a level significantly below their collective total firm contracted; and/or b) Columbia Gulf has sufficient customer activity in the northbound direction that effectively offsets or reduces its southbound requirements.  This customer activity changes on a day-to-day basis and is completely outside of Columbia Gulf's control.  The frequency of this ability has been reduced as of October 1, 2022.  On that date, Columbia Gulf's Louisiana Xpress Project, which FERC approved in 2020, was placed into service.  That project has increased Columbia Gulf's sold firm capacity, and with that increase, Columbia Gulf likely will not be able to consistently use abnormal operations to increase the pressure of Texas Eastern's gas, without shorting customers who do not require special help to get into our pipeline.

13.     Almost constantly since October 1, 2022, Columbia Gulf has had to run its system in the abnormal mode of isolating a section of ML200 in order to compress Texas Eastern's gas and raise its pressure high enough to meet Columbia Gulf's

DocuSign Envelope ID: DBECB508-327C-4A91-8B8F-77D0CBDC48BB

prevailing pressure. For the reasons described above, moving forward, Columbia Gulf will not be able to reliably use abnormal operations to accommodate Texas Eastern's lower pressure.

14.    If Texas Eastern increased the operational pressure of its gas flowing into the Adair Interconnect to meet Columbia Gulf's prevailing pressure, the risk of more curtailments similar to those in November 2019 and May-July 2021 would be negligible.

15.    Moreover, if Texas Eastern adequately modified its system to meet Columbia Gulf's prevailing line pressure, which could reach as high as Columbia Gulf's MAOP, Columbia Gulf would no longer be required to take the mitigation actions outlined above.

16.    If Texas Eastern were to operate their system at a minimum of 750 psig, instead of the historical 600 psig minimum, this would increase the likelihood of Columbia Gulf to be able to receive this gas at the Adair Interconnect. *This scenario is not a solution to the pressure issue*. Columbia Gulf would still have to dedicate a section of ML200 to flow Northbound to tie into the suction of Clementsville compressor station, and thus still not be able to meet their full contractual flows. However, the lower 600 psig pressure forces Columbia Gulf to compress this gas twice; once to get the gas equal to the Clementsville suction pressure, and once to get the gas up to the prevailing line pressure on the discharge of the station. This

DocuSign Envelope ID: DBECB508-327C-4A91-8B8F-77D0CBDC48BB

low pressure uses even more compression, and thus more fuel and personnel hours, that should be dedicated to moving other customers' gas.

17.    Columbia Gulf has designed its system to function at an MAOP of 1,007 psig.  Operating at a lower MAOP would cause Columbia Gulf to not be able to move gas and fulfill the full contractual volume of its other customer commitments.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 27, 2022.

Edgar D. Trillo

Director, Nominations & Scheduling USPL